IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

CALVIN WESLEY,                  )
                                     )
      Plaintiff,              )
                                     )
v.                               )     Civil Action: 6:23cv00012
                                   )
CITY OF LYNCHBURG, *et al.*   )
                                   )
      Defendants.          )

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants City of Lynchburg, Virginia, Officer Seth Reed, Officer Austin Rowland, and Officer Collin Bryant,[1] by counsel, respectfully submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION

This case involves two incidents—separated by months—in which a trained police dog, or K-9, was deployed by a Lynchburg Police Department officer against the Plaintiff Calvin Wesley during the course of his arrests. The crux of his litany of claims is an excessive force claim against Officer Seth Reed, the K-9's handler. Wesley claims Reed should not have let the dog bite him.

In both incidents, Wesley was wanted on an outstanding warrant, was resisting a lawful arrest, was loudly warned multiple times that if he continued to resist the K-9 would bite him, and nevertheless Wesley continued to resist arrest. Wesley is known on the street as "Big Man."

---

[1] The parties filed a Joint Stipulation of Dismissal of Officers Rowland and Bryant on December 14, 2023. (ECF 23.) As the Court has not yet dismissed these officers from this action, to the extent they are still defendants, Officers Rowland and Bryant join the City and Officer Reed in this Memorandum in Support of their Motion for Summary Judgment.

He has had many run-ins with the police. Officers who have had to grapple with him attest that he is a very strong and violent man.

In both incidents, Reed deployed the K-9 in order to detain Wesley, Reed ordered the K-9 to release as soon as Wesley was detained, Wesley's bite wounds were not life-threatening, and Wesley promptly received medical treatment for his injuries.

Wesley claims Officer Reed used excessive force in deploying the K-9, and that the other officers should have intervened. He also claims the City is liable under a *Monell* theory for having an unconstitutional policy or custom of encouraging, enabling, condoning, and ratifying use of excessive force by its police officers.

The undisputed material evidence shows that Officer Reed's behavior was objectively reasonable under the circumstances, and regardless, he is entitled to qualified immunity. The evidence also shows that the City, contrary to Wesley's claims, has an official policy and custom of discouraging, training against, investigating, and disciplining use of excessive force. Thus, the Defendants are entitled to summary judgment.

<u>STATEMENT OF FACTS</u>

**The First Incident: March 11, 2021**

On the afternoon of March 11, 2021, defendant Officer Seth Reed ("Officer Reed") of the Lynchburg Police Department ("LPD") responded to a warrant call on Grace Street in Lynchburg, Virginia. (Reed Tr. at 26.)[2] The wanted subject was Plaintiff Calvin Wesley ("Wesley"), who was wanted on an outstanding domestic assault and battery warrant. (*Id.* at 31.)

In 2017, Officer Reed had occasion to arrest Wesley and had to chase Wesley on foot and then physically fight him for several minutes before another officer arrived to assist Reed. (*Id.* at 18–19.) During that altercation, Wesley bit Officer Reed's fingers, attempted to disarm him, and

---

[2] The cited portions of Officer Reed's deposition transcript is attached hereto as <u>Exhibit 1</u>.

grabbed his genitals repeatedly. (*Id.* at 19–20.)  When the supporting officer arrived, Wesley injured her as well. (*Id.* at 20.) Officer Reed was also aware of another alleged incident in November 2018 in which Wesley physically fought a fellow LPD officer. (*Id.* at 23.)

Due to Wesley's violent history with police, Officer Reed brought his trained police dog, K-9 Officer Knox ("Knox") with him to arrest Wesley. (*Id.* at 28–30.) Officer Reed spotted Wesley getting into the front passenger seat of an idling pickup truck parked in front of a house along Grace Street. (*Id.* at 31.)  He and Knox approached the passenger side of the truck with another LPD officer, opened the door, informed Wesley that they had a warrant for his arrest, and ordered him to step out of the vehicle. (Reed Body Cam 1 01:00.)[3]

Wesley immediately challenged Officer Reed, saying "For what?" (*Id.*) The officers ordered him again to step out of the vehicle. (*Id.*) Wesley stepped out of the truck asking "For what?" and raised his hands toward the officers, who ordered him to place his hands on the vehicle. (*Id.*) He disregarded their orders and persisted: "For what? For what? For what? I'm asking—can't y'all tell me for what?" (*Id.*) During his string of repetitive questions, one of the officers had restated that they had a warrant for his arrest, but Wesley again ignored this information and disregarded multiple orders to put his hands on the vehicle. (*Id.*)

Meanwhile, more LPD officers arrived on scene. (*Id.*) Seeing this, Wesley finally turned toward the vehicle, saying, "Alright, look," and as officers approached and ordered him to put his hands behind his back, he instead placed his hands on the vehicle. (*Id.*) As one of the officers took hold of his left arm and attempted to put it behind his back, Wesley pulled away and again asked, "For what though?" and shouted, "Hey, wait a minute!" (*Id.*)

---

[3] The body camera footage of Officer Reed from the March 11, 2021 incident is attached hereto as Exhibit 2.

An officer forcefully put Wesley's left arm behind his back while pinning him in the hinge joint of the open passenger door of the truck to keep him from fleeing, while another officer grabbed hold of his right wrist and attempted to put his arm behind his back. (*Id.*) At that point, Wesley became physically and verbally combative, pushing his body weight against the officers and attempting to wriggle out of their control while shouting at them. (*Id.*)

Wesley is a large and very strong man. In fact, he's known on the street as "Big Man." (3-11-2021 Incident Report, at 5)[4]  For over twenty seconds he fought against the officers and resisted being handcuffed, so Officer Reed loudly warned Wesley—twice—that if he kept fighting the officers, the "dog" would bite him. (Reed Body Cam 1 01:38.) They managed to get one of the handcuffs around Wesley's left wrist, but they could not secure his right wrist. (*Id.*) Wesley continued to fight the officers for nearly a minute, at one point twisting his upper body around and narrowly missing the officers' faces with his left elbow. (*Id.* 02:05) During the struggle, Wesley's shorts fell down, exposing his rear end. (*Id.*)

Due to Wesley's strength and active resistance, the officers were forced to execute a takedown in order to complete the arrest. (*Id.*) Wesley fought against their efforts, so Officer Reed ordered Knox to assist with the takedown, and Knox complied, biting Wesley in the upper right hamstring where his shorts still covered his skin. (*Id.* 02:23)

Once on the ground, the officers surrounded Wesley and continued their attempts to handcuff him, but Wesley continued to resist. (*Id.*) The officers loudly and repeatedly ordered him, "Give us your hand!" (*Id.*) When Wesley finally stopped fighting and put his hands behind his back, and before officers had completed handcuffing him, Officer Reed ordered Knox to

---

[4] The LPD Incident Report for the March 11, 2021 incident (Case #2021-003502) is attached hereto as <u>Exhibit 3</u>.

release, and Knox immediately complied. (*Id.* 02:39)   Then the officers finished getting the handcuff around Wesley's right wrist. (*Id.*)

One of the officers pulled up Wesley's shorts for him. (*Id.*) The woman sitting inside the truck in the driver's seat asked Officer Reed some questions about the reason for the arrest, and he politely answered them. (*Id.*) The woman was later identified as Bernice Perkins, Wesley's landlady. (Incident Report 3/11/21 at 3[5]; Reed Tr. at 31.)

While Officer Reed was distracted, Knox lunged at Wesley, who was complaining loudly about his discomfort on the ground. (Reed Body Cam 1 03:19.)   Officer Reed prevented Knox from biting Wesley again by yanking on his leash and ordering him to stop, while another officer controlled Wesley's legs. (*Id.*)   When Wesley finally calmed down, the officers assisted him into a seated position against the chain-link fence lining the front yard of the house. (*Id.*)

EMS arrived shortly thereafter and examined Wesley's wounds. (Smith Body Cam 00:45.)[6] Wesley had suffered some lacerations to the back of his right leg, a scrape on his left elbow, and some scrapes on his hands. (*Id.* 02:03; UOF Inv. Report 3/11/21 at 4–5[7].)   He was transported to the hospital where he received further treatment for his wounds. (UOF Inv. Report 3/11/21 at 4–5.)

Due to Wesley's actions, Officer Reed obtained criminal warrants for assault and battery on a police officer and for obstruction of justice, and Officer Bryant obtained a criminal warrant

---

[5] LPD March 11, 2021 Incident Report, <u>Exhibit 3</u>.
[6] The body camera footage of Lt. Brian Smith from the March 11, 2021 incident is attached hereto as <u>Exhibit 4</u>.
[7] The LPD Use of Force Investigation Report for the March 11, 2021 incident is attached hereto as <u>Exhibit 5</u>.

for obstruction of justice for resisting arrest and attempting to flee from a law enforcement officer. (Arrest Warrants 3/11/21.)[8]

### The Second Incident: December 20, 2021

On the night of December 20, 2021, Officer Reed and defendant LPD Officer Collin Bryant ("Officer Bryant") responded to a domestic assault call at an apartment in Lynchburg, VA. (Reed Tr. at 108; Incident Report 12/20/21 at 6[9]; UOF Inv. Report 12/20/21 at 1[10].) The call came from Shana Wesley ("Shana"), Wesley's wife. (*Id.*) She reported that Wesley had been inside her residence and was threatening to punch and choke her and to leave drugs in her house in order to frame her for a possession of a controlled substance. (Incident Report 12/20/21 at 6.) He refused to leave her residence, but left on foot when she called the police. (Reed Tr. at 109.) The responding officers knew that there was an outstanding warrant for Wesley for violation of a protective order. (Reed Tr. at 104; Incident Report 12/20/21 at 6.)

When Officers Reed and Bryant finished interviewing Shana, they canvassed the area for a while but could not locate Wesley. (Reed Tr. at 109; Incident Report 12/20/21 at 6.) Then both officers ran Wesley's information, discovering that there was a valid no-contact protective order between him and Shana, which he violated by being at Shana's home. (Incident Report 12/20/21 at 6.) While Officer Reed was surveying the area in his patrol vehicle, he spotted Wesley walking down from Shana's apartment toward a neighbor's apartment. (Reed Tr. at 109; Incident Report 12/20/21 at 6.) Officer Reed called dispatch, and he and Officer Bryant approached on foot. (*Id.*)

---

[8] The arrest warrants obtained against Wesley for the March 11, 2021 incident are attached hereto as Exhibit 6.

[9] The LPD Incident Report for the December 20, 2021 incident (Case #2021-016418) is attached hereto as Exhibit 7.

[10] The LPD Use of Force Investigation Report for the December 20, 2021 incident is attached hereto as Exhibit 8.

As Officers Reed, Bryant, and K-9 Knox approached the neighbor's apartment on foot, they witnessed Wesley note their presence and immediately enter the neighbor's apartment, shutting the door behind him. (Reed Tr. at 110; Incident Report 12/20/21 at 6.) The neighbor was left standing on the front patio. *Id.* The officers approached and informed the neighbor that Wesley was wanted and that they needed to enter his residence to apprehend him. (Reed Body Cam 2 01:48.)[11] When the neighbor attempted to open the door he found that it was locked. (*Id.*) Officer Reed asked the man if he had any back windows, and he responded affirmatively but added that they are fifteen feet above the ground. (*Id.*)  Officer Reed responded that Wesley would jump that distance. (*Id.*) Someone inside then opened the door. (*Id.*) Officer Reed determined that Wesley had in fact jumped out of a window and asked a woman inside the apartment which window, and she pointed to a back window in the kitchen. (*Id.*) He asked her if Wesley had jumped all the way out, and she nodded affirmatively. (*Id.*)

Meanwhile, Officer Bryant heard branches breaking behind the apartment. (Incident Report 12/20/21 at 3.) He advised a backup unit of Wesley's presumed location while Officer Reed and Knox pursued Wesley into the woods behind the apartment complex. (*Id.*) From the front patio, Officer Bryant could hear Officer Reed advising Wesley that he was wanted, and that if he ran the dog would bite him. (*Id.*)

As Officer Reed entered the woods behind the apartment into which Wesley had fled, defendant LPD Officer Austin Rowland ("Officer Rowland"), who had just arrived on scene, joined him in pursuit. (Rowland Body Cam 01:06.)[12] Trailing Officer Reed and Knox, Officer Rowland was descending the hill behind the apartment complex into the woods when he tripped

---

[11] The body camera footage of Officer Reed from the December 20, 2021 incident is attached hereto as <u>Exhibit 9</u>.
[12] The body camera footage of Officer Rowland from the December 20, 2021 incident is attached hereto as <u>Exhibit 10</u>.

on a fallen tree and injured his left leg. (*Id.*; Rowland Injury Report[13].)  He continued his pursuit at a hobble. (Rowland Body Cam 01:21.)

Officer Reed shouted repeatedly to Wesley while giving chase that he was wanted, and that if he ran, the "dog" would bite him. (Reed Body Cam 04:16.)  He warned Wesley five separate times. (*Id.*)  Wesley continued to flee. (*Id.*)  As Officer Reed emerged from the woods into a clearing behind the apartment complex, Wesley was approaching the rear passenger door of an idling car parked in the middle of a road known as Westbrook Circle. (*Id.* 04:54; Incident Report 12/20/21 at 7.)  Wesley was wearing a pullover sweatshirt and a black vest jacket. (Reed Body Cam 2 05:00; Incident Report 12/20/21 at 6.)  Officer Reed released Knox and ordered him to apprehend Wesley. (Reed Body Cam 2 04:55.)

Knox ran Wesley down and grabbed hold of his sleeved right forearm as he was climbing into the car and pulled him out of the car, which then sped off. (*Id.*)  Wesley proceeded to fight with Knox in the road, punching Knox in the head repeatedly with his left hand, in which he held his belt. (*Id.*)  During the altercation with Knox, Wesley's pants fell down. (*Id.*)

Wesley repeatedly struck Knox on the head. Officer Reed ordered Wesley not to harm the dog and to get on the ground, but Wesley disregarded these orders and continued to fight Knox for nearly a minute. (*Id.*)  As Officer Reed was preparing to physically apprehend Wesley, he observed the red light from Officer Rowland's Taser. (Incident Report 12/20/21 at 7.)  Officer Rowland sternly ordered Wesley to get on the ground, and when Wesley saw the Taser, he finally complied. (Rowland Body Cam 02:45.)

Officer Reed then promptly ordered Knox, whose bite had slipped off the meat of Wesley's arm and onto the sleeve of his sweatshirt, repeatedly and sternly to release. (*Id.*)  In less

---

[13] Officer Rowland's Employee Injury/Illness Report from the December 20, 2021 incident is attached hereto as <u>Exhibit 11</u>.

than twenty seconds Knox complied. (*Id.*) Officer Rowland put away his un-deployed Taser and grabbed hold of Wesley's left arm and attempted to put it behind his back. (*Id.* 03:15.)  Around that time, Officer Bryant arrived on the scene and relieved the injured Officer Rowland. (*Id.*)

Officers on scene promptly called for EMS to respond to their location to examine Wesley's right forearm, which had suffered a deep laceration. (Incident Report 12/20/21 at 7.) He was promptly transported to the hospital for treatment. (*Id.*)  Officer Rowland was also transported to the hospital for his leg injury. (*Id.*) Due to Wesley's actions, Officer Reed obtained criminal warrants for obstructing justice by fleeing from a law enforcement officer and for maliciously causing bodily injury to Knox, and Officer Bryant obtained a criminal warrant for violation of a protective order. (*Id.*; Arrest Warrants 12/20/21[14].)

### Use of Force Training at the Lynchburg Police Department

The Virginia Department of Criminal Justice Services ("DCJS") sets compulsory minimum training requirements to become certified as a law enforcement officer in Virginia. 6VAC20-20-21, 6VAC20-20-30.   These requirements include basic training at a certified criminal justice training academy, involving a minimum of 480 hours of approved training in eight categories. *Id.*  One of these categories is "[d]efensive tactics and use of force." 6VAC20-20-21(B)(1)(f).  DCJS also mandates that officers complete a minimum of 100 hours of approved field training, and a certification exam prior to certification. 6VAC20-20-21(B)(2), (C).  Further, DCJS sets mandatory in-service training requirements to maintain certification, which includes 40 hours of in-service training every two years. (Decl. Gillespie ¶ 2.)[15]  LPD officers must maintain their training to remain certified and work as law enforcement officers. (*Id.* ¶ 3.)

---

[14] The arrest warrants obtained against Wesley for the December 20, 2021 incident are attached hereto as <u>Exhibit 12</u>.

[15] The sworn declaration of Matthew Gillespie, the Training Unit Coordinator for LPD, is attached hereto as <u>Exhibit 13</u>.

LPD officers complete their basic law enforcement training either at the Central Virginia Criminal Justice Academy or another DCJS-approved academy, which includes training on the use of force and proper application of force. (*Id.* ¶ 4.)   Recruits receive training on legal standards for use of force, firearms, and defensive tactics, among other use of force topics. (*Id.* ¶ 5.)   The defensive tactics course at the Academy is 14 days, which involves open hand and impact weapons training. (*Id.* ¶ 6.)

The LPD's in-service training requirements exceed the minimum requirements for in-service training set by DCJS. (*Id.* ¶ 7.)   For example, while state standards require firearms qualification annually, LPD officers qualify multiple times per year, in the spring and fall. (*Id.* ¶ 8.)   Each firearms session also includes a use of force training day, which involves force-on-force training and scenario-based training. (*Id.* ¶ 9.)   During these simulations, officers are trained in real time with simulated weapons as well as hands-on defensive tactics, with role players acting as adversarial suspects. (*Id.* ¶ 10.)   These trainings are meant to develop "good judgment under high stress." (*Id.* ¶ 11.)   The LPD also has training days in the winter and summer (amounting to quarterly training). (*Id.* ¶ 12.)   The vast majority of the winter and summer training events concern use of force. (*Id.* ¶ 13.)   Again, this is typically scenario-based instruction on different applications of force and determining the appropriate level of force to use under the circumstances, or whether to use any force. (*Id.* ¶ 14.)   These scenarios are meant to train on split-second judgment calls. (*Id.* ¶ 15.)   All LPD scenario-based use of force trainings incorporate de-escalation. (*Id.* ¶ 16.)

The LPD also has daily roll call for its patrol and criminal investigations units. (*Id.* ¶ 17.)   On a monthly basis, patrol and criminal investigations officers receive additional training during roll call. (*Id.* ¶ 18.)   This training typically involves reviewing legal updates geared towards law

enforcement trends, and occasionally abbreviated use of force training. (*Id.* ¶ 19.) Separately, the LPD conducts an annual officer training day, which is an 8-hour day traditionally devoted to reviewing legal updates and weapons training. (*Id.* ¶ 20.)  When there are LPD policy updates or new policies, officers are required to review and sign off on them. (*Id.* ¶ 21.)  Generally, this process also involves test questions to ensure officer comprehension. (*Id.* ¶ 22.)

LPD Training Unit Coordinator Matthew Gillespie meets with his training unit staff regularly to develop in-service trainings. (*Id.* ¶ 23.)  The training chosen is driven towards having to meet particular standards, and for re-certifications for particular tools or weapons that the LPD uses. (*Id.* ¶ 24.)  Other training is based on the needs of the department at the time, trends in law enforcement, areas where the LPD has identified that officers may need additional training, et cetera. (*Id.* ¶ 25.)  The LPD provides remedial training when tasked by command staff. (*Id.* ¶ 26.) If an officer requires remedial training based on a specific incident, it is tailored to that officer, to address the deficient area. (*Id.* ¶ 27.)

**Investigating Uses of Force at the LPD**

The City of Lynchburg (the "City") designates oversight of the police department to the Chief of Police.  Chief Zuidema is the final policymaker for the City with respect to LPD policies and use of force investigations.  The LPD maintains Use of Force, Use of Canine Teams policies. (*See* PD21-0602 Use of Force; PD16-0706 and PD21-0706 Use of Canine Teams; and PD21-1601 Internal Investigations.)[16]  Pursuant to those policies, all complaints of excessive force are investigated by a LPD supervisor with a rank of sergeant or higher who was not involved in the use of force incident. (Rodes Decl. ¶ 4.)[17]  In addition, all uses of force that fall under the enumerated criteria in Section III(K)(2)(a)-(k) of the Use of Force Policy are

---

[16] The 2021 Use of Force, Use of Canine Teams and Internal Investigations policies are attached hereto as <u>Exhibit 14</u>.

[17] The sworn declaration of Sergeant Todd Rodes is attached hereto as <u>Exhibit 15</u>.

investigated. (*Id.*)  These categories include, *inter alia*, all uses of force involving weapons and all uses of force in situations resulting in visible injury or complaint of injury to a suspect or arrestee, or visible injury or complaint of injury to an involved officer. (PD21-0602, Use of Force.)

LPD use of force investigations take place as follows: the investigating supervisor reviews the facts by interviewing the individuals involved and any available witnesses, reviewing any available body camera, dash camera, or other camera footage, and reviewing all incident reports, which are generated by the officers involved. (Rodes Decl. ¶ 5.)  The supervisor then makes a report and generates findings and recommendations as to whether he or she believes the officer(s) violated the LPD's use of force policy. (*Id.*)  The supervisor's findings and recommendations are reviewed by each supervisor in the involved officer's chain of command. (*Id.*)  At each level, the LPD supervisor reviews the findings and recommendations of the supervisor below and makes his or her own recommendation. (*Id.*)  This process continues up the chain of command, up to the Chief of Police. (*Id.*)  The Lynchburg Chief of Police is the final authority on use of force investigations, and he (or his designee if he is unavailable) makes the final decision on the findings and punishment, if necessary. (*Id.*)  This was the process performed in the use of force investigation involving Wesley. (*Id.*)  The process is documented on page 16 of the Use of Force Policy (PD21-0602), Section III(L). (*Id.*)

From March 11, 2016 to March 11, 2021 (five years up to and including the date of the first incident involving Wesley), the LPD received 299,338 calls for service. (*Id.* ¶ 2.)  A "call for service" means a call came in from dispatch for officer assistance and an officer responded. (*Id.*)  During that same time frame, there were three sustained excessive force complaints. (*Id.*

¶ 6.)  With respect to the three sustained complaints, each officer found to have used excessive force was disciplined pursuant to the LPD Disciplinary System (PD19-0212).[18] (*Id.* ¶ 7.)

The LPD provides the Lynchburg City Attorney full, unredacted copies of all use of force investigations, including the findings and recommendations. (*Id.* ¶ 8.) Also, for exculpatory purposes, the Commonwealth's Attorney receives redacted copies of all use of force investigations that involve a suspect being prosecuted. (*Id.* ¶ 9.)  These redacted investigations inform the Commonwealth's Attorney of "the force that was applied to that person." (*Id.* ¶ 10.) Additionally, the LPD provides all use of force incidents to the City's Community Policing Advisory Group ("CPAG"), which is comprised of 29 total members—16 sworn LPD officers, 3 non-sworn LPD officers, and 10 non-law enforcement members of the community. (*Id.* ¶ 11.) The Group meets bi-monthly and reviews and discusses all use of force incidents. (*Id.*)  An LPD captain attends the meetings and receives input from the group. (*Id.* ¶ 12.)

### The Use of Force Investigations in this Case

The LPD performed thorough use of force investigations in this case. (*See generally* UOF Inv. Report 3/11/21; UOF Inv. Report 12/20/21.)  On the afternoon of March 11, 2021, shortly after Wesley was detained, LPD Lieutenant Brian Smith ("Lt. Smith") arrived on scene and began a use of force investigation. (Smith Body Cam 1 00:40.)[19]  The investigation was initiated pursuant to standard procedure, as outlined in the Use of Force Policy (PD21-0602).  Lt. Smith talked to Officer Reed, took photographs of Wesley's injuries, interviewed Wesley, interviewed Bernice Perkins, and then talked briefly to some of the other officers involved.  (*Id.* 00:54.) Shortly thereafter he interviewed involved officers, including Officer Reed. (*See generally* Smith

---

[18] The LPD Disciplinary System Policy in place at the time of the incidents with Wesley is attached to Exhibit 15, Sergeant Rodes' Declaration.

[19] The body camera footage of Lt. Smith from shortly after the March 11, 2021 incident, attached hereto as Exhibit 4.

Body Cam 2.)[20]   He reviewed body camera footage. (UOF Inv. Report 3/11/21 at 2.) He then

turned over the investigation to LPD Lieutenant Lucas Bryan ("Lt. Bryan") in the LPD

Professional Standards Unit. (*Id.* at 1.)  Lt. Bryan reviewed the incident reports, interviewed and

obtained statements from all responding officers to the March 11, 2021 call, and reviewed body

camera footage. (*Id.* at 6–7.)  He then prepared an administrative report and forwarded it up the

chain of command. (*Id.* at 7–10.)  Officer Reed's and the other officers' actions were found to be

within policy according to the Use of Force Policy guidelines. (*Id.* at 10.)

On the night of December 20, 2021, shortly after Wesley was detained, LPD Officer

Vernon Parrish ("Officer Parrish") arrived on scene and began a use of force investigation.

(Parrish Body Cam 1 00:45.)[21]   The investigation was initiated pursuant to standard procedure,

as outlined in the Use of Force Policy (PD21-0602).   Officer Parrish talked to some of the

officers involved in the incident, took body camera footage of Wesley, and interviewed Officer

Rowland.   (*Id.*)   Early the following morning, he interviewed Officer Reed. (*See generally*

Parrish Body Cam 2.)[22] He then turned over the investigation to LPD Captain Lisa Singleton

("Capt. Singleton") in the LPD Professional Standards Unit. (UOF Inv. Report 12/20/21 at 1.)

Capt. Singleton reviewed the incident reports, interviewed and obtained statements from all

responding officers to the December 20, 2021 call, and reviewed body camera footage. (*Id.* at 1–

2.) She then prepared an administrative report and forwarded it up the chain of command. (*Id.* at

5–9.)  The defendant officers' actions were found to be within policy according to the Use of

Force Policy guidelines. (*Id.* at 7.)

---

[20] The body camera footage of Lt. Smith from his interview with Officer Reed following the March 11, 2021 incident is attached hereto as Exhibit 16.

[21] The body camera footage of Officer Parrish from shortly after the December 20, 2021 incident is attached hereto as Exhibit 17.

[22] The body camera footage of Officer Parrish from his interview with Officer Reed shortly following the December 20, 2021 incident is attached hereto as Exhibit 18.

**Wesley's Complaint**

Wesley brings this action pursuant to 42 U.S.C. §§ 1983 and 1985, as well as Virginia common law.   (Complaint, ECF No. 1.)   He claims Officer Reed violated his Fourth and Fourteenth Amendment rights by (i) using excessive force (Counts I and III), and (ii) conspiring to violate his civil rights (Counts V and VI).   He claims Officers Rowland and Bryant violated his Fourth and Fourteenth Amendment rights by (i) failing to intervene (Count IV) and (ii) conspiring to violate his civil rights (Count VI).

Wesley further claims the City of Lynchburg, under a theory of municipal liability, violated his Fourth and Fourteenth Amendment rights by (i) maintaining an alleged custom or practice of allowing its officers to use excessive force (Counts VII and VIII), (ii) failing to train its officers on proper use of force (Counts IX and X), (iii) failing to discipline its officers for using excessive force (Counts XI and XII), and (iv) ratifying its officers' use of excessive force (Counts XIII and XIV).

Finally, Wesley claims Officer Reed committed the state law tort of intentional infliction of emotional distress (Counts XV and XVI), and that Officers Reed, Rowland, and Bryant committed the state law torts of (i) assault and battery (Counts XVII and XVIII), and (ii) gross, willful, wanton and reckless negligence (Counts XIX, XX and XXI[23]).   Wesley seeks judgment against each of the Defendants, jointly and severally, in the amount of TEN MILLION DOLLARS ($10,000,000.00), as well as punitive damages from each of the defendant officers, costs and expenses (including attorney's fees), and injunctive relief.

For the following reasons, the Defendants are entitled to summary judgment.

---

[23] The remaining claim against the City in Count XXI of the Complaint was dismissed by the Court on May 18, 2023. (ECF 17.)

<u>ARGUMENTS</u>

**I.    Standard of Review**

"The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199-200 (4th Cir. 1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

On a motion for summary judgment, the "court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "[E]ven when all evidence is viewed in the light most favorable to the nonmoving party, the nonmoving party cannot defeat a properly supported summary judgment motion without presenting 'significant probative evidence.'" *Pueschel v. Peters*, 340 F. App'x 858, 860 (4th Cir. 2009) (quoting *Liberty Lobby*, 477 U.S. at 249). "A mere scintilla of evidence is not enough to create an issue; there must be evidence on which a jury might rely." *Seago v. N.C. Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1967), *aff'd*, 388 F.2d 987 (4th Cir. 1967).

**II.    The defendant officers are not liable because Wesley cannot establish any Fourth Amendment violations as a matter of law, and the officers did not violate his clearly established constitutional rights (Counts I, III, IV, V, and VI).**

### A. Officer Reed's use of force was not excessive.

Courts consider the following non-exhaustive list of factors when evaluating excessive force claims: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Martin v. Shaw*, 2021 U.S. Dist. LEXIS 31330, at *11 (W.D. Va. Feb. 19, 2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

### i. Use of force in the March 11, 2021 incident

With respect to this incident, Wesley claims Officer Reed used excessive force when he deployed K-9 Knox against Wesley. Application of the *Kingsley* factors to Officer Reed's use of force during this incident weighs heavily in his favor. One, he used exactly as much force as was necessary to complete the takedown of Wesley. While Wesley received some punctures and lacerations to the back of his leg, none of them were serious or life-threatening. Officer Reed and the other officers on the scene made multiple efforts to convince Wesley to put his hands behind his back, and Officer Reed gave him two clear warnings before deploying the dog. The security problem of a strong and highly resistant individual had become increasingly severe as Wesley refused to allow himself to be handcuffed and was wriggling and twisting out of the control of the officers, narrowly missing their faces with his elbow. Officer Reed had personal experience with Wesley and knew first-hand that he was a serious threat to officer safety, especially if he managed to get loose. And finally, Wesley was actively resisting arrest.

The circumstances of this incident required "quick and decisive action in the face of volatile and changing circumstances.'" *Nadelin v. Martin*, 1998 U.S. App. LEXIS 29516, at *9-10 (4th Cir. Nov. 19, 1998) (quoting *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)).

Importantly, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment." *Graham*, 490 U.S. 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  This holds true even if police could "have handled the situation in a kinder and gentler manner."  *Nadelin*, 1998 U.S. App. LEXIS at *11.

In an analogous case from the Sixth Circuit, *Zuress v. City of Newark*, police surveilled a known drug house looking for plaintiff's boyfriend, Grooms, who had an outstanding arrest warrant and was a person of interest in an armed robbery.  815 F. App'x 1, 2-3 (6th Cir. 2020).  The canine-handling officer, Burris, received a tip that Grooms had arrived at the house, so Officer Burris and another officer, Officer Hunt, drove to it.  *Id.* at 3.  The officers saw Grooms' Jeep leave the residence, and the officers pulled it over.  *Id.*

Once the Jeep stopped, Grooms fled.  *Id.*  Shortly thereafter, the remaining person in the Jeep drove away.  *Id.*  Another officer, Purtee, intercepted the Jeep in his cruiser.  *Id.*  Officers Burris and Hunt caught up, and pulled up behind Purtee.  *Id.*  Officer Purtee exited his vehicle and assumed a shooting stance.  *Id.*  Officer Purtee commanded the driver, plaintiff Zuress, to exit the vehicle.  *Id.*

After three commands to exit, Zuress complied, but when she exited she was facing the officers.  *Id.*  Purtee ordered Zuress to turn around, but Zuress refused.  *Id.*  Purtee told Zuress to "turn away" five times before she initially complied, but she then turned back around to again face the officers.  *Id.*  Further, she disobeyed Officer Purtee's command to walk backwards towards him.  *Id.*  Instead, Zuress argued with Purtee, waved her hands around, and reached down towards her waistband, adjusting her shirt or pants.  *Id.*

Officer Purtee warned Zuress he would deploy the dog if she did not comply.  *Id.*  One or two seconds after Purtee gave that warning, Officer Burris released his canine partner, Ike.  At the same time, Officer Burris approached Zuress.  *Id.*  At about the time Burris made physical contact with Zuress, canine Ike bit Zuress' arm and held his bite.  *Id.*  Officer Burris, Zuress, and Ike all fell to the ground, at which point other officers advanced.  *Id.*  Once the Jeep was confirmed to be clear of other occupants, another officer took Burris' place on top of Zuress to secure her while Burris moved to get Ike to release his bite.  *Id.*  Officer Burris struggled with Ike for 24 seconds before Ike released his bite.  *Id.*

On these facts, Zuress claimed Officer Burris used excessive force in violation of the Fourth Amendment when he deployed the police dog and allowed the dog to continue to bite her after she had been subdued.  *Id.* at 4.  The Sixth Circuit panel, guided by the *Graham* factors, held Officer Burris' actions did not violate Zuress' Fourth Amendment rights.  *Id.* at 7.

With respect to whether Zuress presented a threat to the officers, the panel noted the suspicious circumstances in which the officers encountered Zuress (traveling from a known drug house with a companion who fled, had an outstanding warrant, and was a person of interest in an armed robbery), Zuress was an "unknown quantity" and failed to follow commands, the officers did not know if she or others in the vehicle were armed, and, "perhaps most importantly," Zuress "was not complying with the officers' commands; she was arguing, waving her hands around, turning to face the officers, and even reached for her waistband where a weapon could have been." *Id.* at 5.

With respect to whether Zuress was resisting, the panel found Zuress' "repeated non-compliance—coupled with her arguing with the officers—put her conduct just over the line into the active-resistance category." *Id.* at 6.  Only the severity-of-the-crime factor weighed in

Zuress' favor (at most Zuress committed minor misdemeanors by driving away from the officers). *Id.* The panel found, however, that the paramount inquiry was whether the "totality of the circumstances" justified the degree of force used. *Id.* Ultimately, the totality of the circumstances justified Officer Burris' use of the canine. *Id.* at 7.

Many of the circumstances in *Zuress* parallel those in the March 11, 2021 incident involving Wesley. The deputies encountered Wesley in a parked and idling vehicle. He was wanted for an outstanding warrant for assault and battery. Wesley was not an "unknown quantity," he was known for having violently fought with officers in the past. The officers did not know if he was armed, but they knew that he was dangerous. And, "perhaps most importantly," Wesley did not comply with the officers' commands. *See Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force . . . the level of justified force varies based on the risks posed by the resistance.") He argued, waved his arms, faced the officers when he was ordered to turn around and placed his hands on the vehicle, refused to comply with those orders, refused to be handcuffed, and was physically and verbally combative throughout.

To be sure, there are significant differences between *Zuress* and this case. In *Zuress*, the officers encountered the plaintiff during a criminal investigation; here, the officers were responding to a warrant call specifically for Wesley for a charge of assault and battery. Unlike in *Zuress*, the *Graham* severity-of-the-crime factor arguably weighs in the officers' favor here. Regardless, this factor "is intended as a proxy" for determining whether the officer had reason to believe the subject of the seizure 'was a potentially dangerous individual.'" *Armstrong*, 810 F.3d at 900 (quoting *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015)). Here, Officer Reed had reliable

information—his own past experience—that Wesley was violent and dangerous toward police officers.

Another significant difference is that in *Zuress*, the handling officer struggled with his police dog for 24 seconds before he released his bite, whereas here Knox released quickly after Officer Reed ordered him to do so.

It was reasonable for Officer Reed to use the police dog in light of his personal knowledge that Wesley had in the past been violent and dangerous toward police officers, coupled with Wesley's noncompliant and belligerent behavior at the scene. *See Mickle v. Ahmed*, 444 F. Supp. 2d 601, 611 (D.S.C. 2006) ("[T]he use of police dogs can (1) prevent officers from having to resort to deadly force and (2) protect the officers from being subjected to deadly force used against them by suspects attempting to avoid arrest.").

Furthermore, Officer Reed warned Wesley twice that he would release Knox if Wesley did not follow commands, which was more warning than the officers gave in *Zuress*. *See Shockley v. Foster*, 2021 U.S. Dist. LEXIS 127382, at *18 (E.D. Va. July 7, 2021) ("use of a warning indicates the officers 'were trying to avoid unnecessary harm'").  Wesley had ample opportunity to avoid being bitten.  He could have simply followed the officers' verbal commands to put his hands behind his back and allowed himself to be handcuffed.  He repeatedly refused and resisted being handcuffed.

Wesley further argues Officer Reed is liable for excessive force because Officer Reed gave an order to Knox which resulted in Knox biting Wesley again after he was handcuffed. This allegation is flatly contradicted by the video evidence, which shows that Officer Reed called off Knox *before* both of Wesley's hands were in cuffs, and not only did he not order Knox to bite Wesley again, but he actively prevented Knox from biting Wesley again.

Finally, Officer Reed escalated his force from verbal commands when it was clear Wesley would not voluntarily comply, and de-escalated force when Wesley was secured.  *See Unus v. Kane*, 565 F.3d 103, 120-21 (4th Cir. 2009) (finding the officers appropriately reassessed the need for force as the situation progressed).  This was a volatile situation with a large, strong, and potentially dangerous individual.  The circumstances were "tense, uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396-97.  In such circumstances, courts should "make allowances for on-the-scene decisions about the amount of force that is necessary, 'even if it may later seem unnecessary in the peace of a judge's chambers[.]'"  *Maney v. Garrison*, 681 F. App'x 210, 221 (4th Cir. 2017) (quoting *Graham*, 490 U.S. at 396-97).  Officer Reed reasonably used Knox to ensure the safety of all officers involved.

### ii.   Use of force in the December 20, 2021 incident

Application of the *Kingsley* factors to Officer Reed's use of force during the December 20 incident weighs heavily in his favor.  One, he used exactly as much force as was necessary to complete the apprehension and takedown of Wesley, who was fleeing arrest for an outstanding warrant for violation of a protective order and who was attempting to enter an unknown citizen's vehicle.  While Wesley did receive a deep laceration and some punctures to his right forearm, the injuries were not life-threatening.  Officer Reed gave Wesley multiple clear warnings before deploying Knox that if he continued to run, the dog would bite him, and once Knox did bite, he gave multiple orders to Wesley to get on the ground, which orders Wesley ignored.  Instead, he continued to fight Knox and punch him in the head repeatedly, no doubt exacerbating the severity of the bite. The security problem of a strong and extremely violent individual had become increasingly severe as Wesley was attempting to enter an unknown citizen's vehicle. Officer Reed had personal experience with Wesley and knew first-hand that he was a serious

threat not only to officer safety, but also citizen safety, as he had been charged with assault and battery before.  And finally, Wesley was actively resisting arrest by fleeing from Officers Reed, Rowland, and Bryant.

Wesley further claims that Officer Reed unreasonably seized him when he allowed Knox to continue to bite Wesley "for several minutes." First, Wesley's allegation that Officer Reed allowed Knox to bite him "for several minutes" is flatly contradicted by the body cam footage. From the moment Wesley finally got on the ground to the moment Officer Reed began giving Knox the command to release was no more than 12 or 13 seconds.  At that time Wesley had not even been cuffed on his free hand.  While it did take slightly over 20 seconds for Knox to fully release, he was off the meat of Wesley's arm and onto the sleeve after 5 seconds.  Despite the delay, the bite lasted no longer than 40 seconds.

Second, this is not the kind of delay that rises to the level of an unreasonable seizure.  *See Zuress*, 815 F. App'x at 7 (finding an 11-second delay between the time the officer had another officer take his place securing the plaintiff, to when he started commanding the dog to release his bite, was reasonable); *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (finding a 5-10 second delay for the officer to call off the dog after the plaintiff was handcuffed was reasonable); *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (concluding it was reasonable for the defendant officer to wait on calling off the canine until the plaintiff was handcuffed and secured).

Officer Reed began giving commands for Knox to release within 13 seconds of Wesley going to the ground, and before his free hand had even been cuffed by Officer Rowland.  Any delay in Knox releasing his bite after having received the order to release from Officer Reed is not a violation of Wesley's Fourth Amendment rights by Officer Reed.  For a seizure to occur, an officer must terminate a person's freedom of movement "through means intentionally

applied." *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989).  While Officer Reed was working to get Knox to release his bite, the continued bite was not a "means intentionally applied."  Officer Reed therefore cannot be liable under the Fourth Amendment for the time it took Knox to release his bite.

**B.  Officers Rowland and Bryant are not liable as bystanders to Officer Reed's alleged use of excessive force.**

As an initial matter, Wesley's bystander claim against Officers Rowland and Bryant must fail because the force employed by Officer Reed was not excessive.  It was necessary to subdue Wesley, a dangerous and fleeing wanted man.  Moreover, Wesley's claims against Officers Rowland and Bryant must fail because he cannot establish any of the elements to impart supervisory liability.

An officer may be held liable under § 1983 on a theory of bystander liability only if he (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002).

Wesley cannot show that Officers Rowland and Bryant knew Wesley's rights were violated, had any reasonable opportunity to prevent the harm, or chose not to act.  *See Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002).

The undisputed facts show that Officer Rowland joined Officer Reed in his pursuit of Wesley in order to assist in arresting him, fell behind due to an injury received while descending a hill, caught up with Officer Reed after he had already deployed Knox, and promptly grounded and subdued Wesley so that Officer Reed could remove Knox from the bite.  Officer Rowland

had no opportunity to prevent the alleged harm nor did he choose not to act.  Accordingly, Wesley's bystander liability claim against him fails as a matter of law.

Similarly, the undisputed facts show that Officer Bryant joined Officers Reed and Rowland in their pursuit of Wesley in order to assist in arresting him, lagged behind in order to secure the previous scene and call in backup, caught up with Officers Reed and Rowland after Officer Reed had already called off and removed Knox, and promptly relieved the injured Officer Rowland from his job of handcuffing Wesley on the ground.  Officer Bryant had no opportunity to prevent the alleged harm nor did he choose not to act.  Accordingly, Wesley's bystander liability claim against him fails as a matter of law.

### C.  The officers did not conspire to violate Wesley's civil rights.

The undisputed facts fail as a matter of law to demonstrate that the defendant officers participated in a conspiracy under 42 U.S.C. § 1985 to deprive Wesley of his constitutional rights. "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates."  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).  A plaintiff must show five elements to state a claim for a § 1985 conspiracy:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without a Name v. Va.*, 655 F.3d 342, 346 (4th Cir. 2011).

A plaintiff additionally "must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights."  *Id.* (internal citations and quotations omitted).  There is a "weighty burden to properly bring" a § 1985 conspiracy claim.  *Smith v. Town of South Hill*, 2020 U.S. Dist. LEXIS 49002, *66, 2020 WL 1324216, *26 (E.D. Va. Mar.

20, 2020) (citation omitted).  Conspiracy claims are to be rejected "whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *A Soc'y Without a Name*, 655 F.3d at 346.

Here, there is no evidence that any of the defendant officers had a meeting of the minds with any other defendant officer to violate Wesley's constitutional rights. Thus, the undisputed facts do not demonstrate the kind of concerted activity in furtherance of a conspiracy required for a § 1985 conspiracy claim.

### D.  The officers are entitled to qualified immunity.

Qualified immunity shields government officials from civil liability as long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts use a two-pronged inquiry to resolve questions of qualified immunity.  *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first asks whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation.  *Id.* at 655-66.  The second asks whether the right was clearly established at the time of the violation.  *Id.* at 666.  Courts have discretion to decide the order in which to decide these two questions.  *Id.*

To the extent there is any question whether Officer Reed's use of force crossed constitutional boundaries, he is entitled to qualified immunity.  Given the absence of authoritative case law, a reasonable officer in Officer Reed's position would not have known his decision to use Knox constituted excessive force.  At worst, it was a legal gray area, to which qualified immunity applies.  *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

"'Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to

26

effect it.'"  *E.W. v. Dolgos*, 884 F.3d 172, 192 (4th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Fourth Circuit Court of Appeals has confirmed that officers are allowed to use proportionate force when a suspect resists lawful detention because deciding otherwise "would be inviting any suspect who is unhappy about a [lawful arrest] to resist that [arrest] in the hopes that the officers will simply desist rather than risk liability."  *Brown v. Gilmore*, 278 F.3d 362, 370 (4th Cir. 2002).  Trial courts in the Fourth Circuit have found that an officer's decision to take down a suspect was justified in response to even less resistance by a suspect. *See, Geba v. Norris*, 2016 U.S. Dist. LEXIS 191562, at *14-15 (E.D. Va. Apr. 4, 2016) (defendant officer acted reasonably by tackling plaintiff, who was merely suspected of public intoxication, when plaintiff attempted to leave the police trailer despite the officer's command for her to stay); *Jackson v. Boyd*, 1997 U.S. Dist. LEXIS 20429, at *6-7 (E.D.N.C. Nov. 18, 1997) (defendant officer acted reasonably by tackling plaintiff when plaintiff fled on foot after being informed he was under arrest for carrying a concealed weapon).

Officer Reed escalated his force from verbal commands when it was clear that Wesley would not voluntarily comply, and de-escalated force when he was secure.  *See Unus v. Kane*, 565 F.3d 103, 120-21 (4th Cir. 2009) (finding the officers properly assessed the situation as it progressed and escalated and de-escalated force based on the circumstances presented).  Officer Reed did not violate Wesley's Fourth Amendment rights because his use of force was reasonable given Wesley's physical resistance and combative behavior during his arrest.  Moreover, no reasonable officer in Officer Reed's position would have known he violated Wesley's constitutional rights.  Accordingly, Officer Reed is entitled to qualified immunity.

Here, Officer Rowland believed that Wesley was wanted on an outstanding warrant and was merely assisting in the arrest.  He heard Officer Reed give multiple verbal warnings to

Wesley that if he continued to run, the dog would bite him.  Wesley, though unarmed, was not yet secured and was known to be violent toward police officers.  Officer Rowland did not violate Wesley's Fourth Amendment rights because his decision to ground Wesley instead of pull off Knox was reasonable given Wesley's physical resistance during arrest and refusal to follow orders to get on the ground.  Moreover, in light of the authorities discussed, no reasonable officer in Officer Rowland's position would have known he violated Wesley's constitutional rights.  Accordingly, Officer Rowland is entitled to qualified immunity.

Similarly, Officer Bryant believed that Wesley was wanted on an outstanding warrant and was merely assisting in the arrest.  He heard Officer Reed give multiple verbal warnings to Wesley that if he continued to run, the dog would bite him.  Wesley, though unarmed, was not yet secured and was known to be violent toward police officers.  And Knox had already been called off and had released his bite when Officer Bryant encountered Wesley and the other officers.  Officer Bryant did not violate Wesley's Fourth Amendment rights because he literally could not have intervened or conspired to violate Wesley's rights.  Knox had already been called off of Wesley when Officer Bryant arrived on the scene.  Moreover, in light of the authorities discussed, no reasonable officer in Officer Bryant's position would have known he violated Wesley's constitutional rights.  Accordingly, Officer Bryant is entitled to qualified immunity.

## III.    The City of Lynchburg is entitled to summary judgment on Wesley's *Monell* claims (Counts VII, VIII, IX, X, XI, XII, XIII, and XIV).

Wesley asserted *Monell* claims against the City in Counts VII and VIII (unconstitutional custom or policy), IX and X (failure to train), XI and XII (failure to discipline), and XIII and XIV (ratification).  At the outset, these claims must be dismissed because Wesley cannot support the underlying constitutional claims against the individual officers.  *See Turner v. Thomas*, 313 F. Supp. 3d 704, 716 (W.D. Va. 2018) ("For a municipality to be liable under 1983, a plaintiff

must demonstrate an underlying constitutional violation.") (citing *Waybright v. Frederick Cty. MD*, 528 F.3d 199, 203 (4th Cir. 2008)).  Moreover, no reasonable juror could find the City had a policy or custom that caused a deprivation of Wesley's Fourth or Fourteenth Amendment rights.

A local government entity cannot be held liable under § 1983 for injuries inflicted solely by its employees or agents.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Local governments are only liable for their own illegal acts.  Accordingly, to impose liability on a governmental entity, a plaintiff must establish the existence of an official policy or custom that caused the constitutional deprivations.  *Id.*  The entity may be held liable only when its policy or custom is "the moving force of the constitutional violation."  *Id.*

**A.     No reasonable juror could find that the City has a policy of unconstitutional use of force.**

In Counts VII and VIII, Wesley asserts a *Monell* claim based on a theory of unconstitutional custom.  In other words, Wesley attempts to show that the City "fail[ed] to put a stop to or correct a widespread pattern of unconstitutional [excessive force by police officers]." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Spell*, 824 F.2d at 1389).  Prevailing under this theory "is no easy task."  *Id.*  Wesley must point to a "persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference."  *Id.* (internal citations omitted).  "A court may infer that a custom exists 'from continued inaction in the face of a known history of *widespread* constitutional deprivations on the part of city employees' but not 'merely from municipal inaction in the face of *isolated* constitutional deprivations by municipal employees.'" *Booker v. City of Lynchburg*, 2021 U.S. Dist. LEXIS 26538, at *9 (W.D. Va. Feb. 11, 2021) (quoting *Milligan v. Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984)).  Further, the custom

"must be of such a character that municipal employees could reasonably infer from it tacit approval of the conduct in issue." *Id.* (citing *Milligan*, 743 F.2d at 230).

To demonstrate the requisite causation, Wesley must show the unconstitutional custom proximately caused his alleged Fourth Amendment deprivations. *Jackson v. Brickey*, 771 F. Supp. 2d 593, 604 (W.D. Va. 2011). That is, Wesley must show there existed a pattern of widespread constitutional violations that were "specific and similar enough" to the conduct at issue that the City's indifference to them could be seen as a "deliberate choice." *Booker*, 2021 U.S. Dist. LEXIS at *9-10 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Wesley has not adduced evidence to demonstrate a history of widespread, similar uses of excessive force by the City's police officers, nor has he shown deliberate indifference by the City. Rather, the evidence demonstrates that despite receiving 299,338 calls for service in the five years preceding Wesley's incident, the LPD had only three sustained complaints of excessive force in that time.[24] Moreover, in circumstances like this case, where a suspect receives visible injury, the LPD investigates *every* use of force, and virtually all other uses of force, even without a complaint. Each use of force investigation is performed by a LPD supervisor (rank of sergeant or higher) who was uninvolved in the use of force incident. The supervisor's findings are reviewed by each supervisor in the involved officer's chain of command, up to Chief Zuidema, who is the final authority and makes the final decision on findings and, if necessary, punishment.

The City designates oversight of the police department to the Chief of Police. Chief Zuidema is the final policymaker for the City with respect to LPD policies and use of force investigations. This is not a novel concept. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (finding the Chief of Police of Newport News, Virginia was the final policymaker

---

[24] The officers found to have used excessive force were disciplined.

because he was "responsible for the choice and implementation of police department practices and procedures").

Wesley appears to argue that City officials—independent from the Chief or other law enforcement—had a constitutional duty to investigate uses of force by LPD officers. But the constitutional mandate is that the City not consciously disregard widespread uses of excessive force by its police officers. The City accomplishes that mandate through the multi-level LPD investigative process. There is no evidence to demonstrate that the process is inadequate, or that widespread excessive force is permitted to go unchecked. And there is no case establishing a constitutional duty for a municipality to have non-law enforcement officials conduct independent excessive force investigations.

Furthermore, even if such a duty existed, LPD officers have independent oversight. The City Attorney receives full, unredacted copies of all use of force investigations, including the findings and recommendations. Also, for exculpatory purposes, the Commonwealth's Attorney receives redacted copies of all use of force investigations that involve a suspect being prosecuted. Additionally, the LPD provides all use of force incidents to the 29-member law enforcement group CPAG. The group meets bi-monthly, reviews and discusses all use of force incidents, and provides input to an LPD captain. In short, given the lack of excessive force incidents, thorough internal processes, and external oversight, no reasonable juror could find the City has a custom of permitting excessive force by LPD officers.

**B.    No reasonable juror could find that the City has a policy of constitutionally deficient training with respect to use of force.**

Wesley also claims the City has unconstitutional training deficiencies with respect to preventing excessive force. To establish municipal liability on the basis of failure-to-train, Wesley must establish the City has a policy of inadequate training with respect to particular

tasks, for which "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need, and that the inadequate training actually caused a claimed injury." *Revene v. Charles County Comm'rs*, 882 F.2d 870, 874-75 (4th Cir. 1989) (internal quotations and citations omitted).  Wesley must prove "specific deficiencies in training." *Id.* at 875; *Allen v. City of Fredericksburg*, 2011 U.S. Dist. LEXIS 17405, at *23-24 (E.D. Va. Feb. 20, 2011); *Johnson v. Balt. Police Dep't*, 2020 U.S. Dist. LEXIS 61052, at *56 (D. Md. Apr. 7, 2020).  Generally, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of a failure to train claim. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

As discussed, Wesley cannot demonstrate a pattern of constitutional violations by untrained LPD officers. The LPD takes considerable measures to ensure its officers are adequately trained on the use of force.  This starts with completing the compulsory minimum training requirements set by DCJS, which includes "defensive tactics and use of force" as one of eight mandatory categories trained on during the 480-hour minimum training at a certified criminal justice academy.  DCJS further requires 100 hours of field training, a certification exam, and 40 hours of approved, in-service training every two years.  LPD officers must maintain their training to be certified and work as law enforcement on the street.

At the Central Virginia Criminal Justice Academy, or another DCJS-approved academy, LPD officers receive training on the use of force and proper application of force.  Recruits receive training on legal standards for use of force, firearms, and defensive tactics, among other use of force topics.  The defensive tactics course at the Academy is 14 days and involves open hand and impact weapons training.

The LPD's in-service training requirements exceed the minimum requirements for in-service training set by DCJS, and officers have quarterly scenario-based training on use of force. During these simulations, officers are trained in real time with simulated weapons and hands-on defensive tactics, with role players acting as adversarial suspects.  These trainings are designed to develop "good judgment under high stress" and split-second judgment calls.  And all scenario-based use of force trainings incorporate de-escalation.

Patrol and criminal investigations officers also have roll call training on a monthly basis, which usually involves reviewing legal updates and is geared towards law enforcement trends. Occasionally, this roll call training also includes abbreviated use of force training.  Separately, the LPD conducts an annual 8-hour officer training day, typically involving the review of legal updates and weapons training.  LPD Training Unit Coordinator Matthew Gillespie meets with his training unit staff regularly to develop in-service training, to fit departmental needs or trends in law enforcement.  The LPD also provides remedial training as necessary, which is targeted to address the individual officer's deficient area.  In sum, the LPD thoroughly trains its officers on use of force topics on a frequent basis.

C.   **No reasonable juror could find that the City has an unconstitutional policy of failing to discipline use of excessive force.**

Wesley's *Monell* claim for failure to discipline is also without merit. To state a claim under *Monell* for failure to supervise or discipline, the plaintiff must allege

> (1) that the supervisor had "actual or constructive knowledge" that a subordinate was engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury"; (2) that the supervisor's response to that knowledge "was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) an "affirmative causal link" between the supervisor's inaction and the plaintiff's alleged constitutional injury.

33

*Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

When addressing a failure to discipline claim, "an unconstitutional policy or custom based on evidence of a failure to discipline generally requires a showing of a pattern of misconduct in which there has been such a failure. Evidence of a single instance in which there was a failure to discipline is insufficient." *Green v. Mills*, No. 3:19cv906, 2020 U.S. Dist. LEXIS 97270, at *30-31 (E.D. Va. June 2, 2020) (quoting 13 Am. Jur. *Proof of Facts* 3d 1, § 12 (2020)).

Here, not only is there no evidence that there was a failure to discipline in either of the instances in this case, but there is no evidence that there is a pattern of misconduct indicating that there is a widespread failure to discipline use of excessive force generally.

On the contrary, the LPD performed thorough use of force investigations in this case. The Lynchburg Chief of Police is the final authority on use of force investigations, and he (or his designee if he is unavailable) makes the final decision on the findings and punishment, if necessary. This was the process performed in the use of force investigation involving Wesley.

Additionally, the evidence demonstrates that despite receiving 299,338 calls for service in the five years preceding Wesley's incident, the LPD had only three sustained complaints of excessive force in that time, and the officers found to have used excessive force were disciplined.

There is simply no evidence of an unconstitutional policy of failure to discipline LPD officers for use of excessive force.

**D.**      **No reasonable juror could find the City liable under a ratification theory.**

When an officer's decision is reviewed by a municipal policymaker, the policymaker has authority to measure the officer's conduct for conformance with the municipality's policies. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Starbuck v. Williamsburg James City Cty. Sch.*

*Bd.*, 28 F.4th 529, 535 n. 4 (4th Cir. 2022).  If a policymaker "approves a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."  *Praprotnik*, 485 U.S. at 127.  Here, Chief Zuidema's (or his designee's) approval of his subordinates' use of force came after a comprehensive investigation that followed the chain of command.  For the reasons discussed in section II of this Memorandum, the individual officers acted well within constitutional boundaries.  No reasonable juror could find the City liable on a theory of ratification.

**IV.  Officer Reed is entitled to summary judgment on Wesley's IIED claims because IIED is a non-tactile tort and thus does not apply. (Counts XV and XVI).**

Intentional infliction of emotional distress ("IIED") is not an appropriate vehicle to address the tactile wrongs allegedly executed by Officer Reed.  The Supreme Court of Virginia has recognized that this claim is disfavored "because there are inherent problems in proving a claim alleging injury to the mind or emotions *in the absence of accompanying physical injury*."  *SuperValu, Inc. v. Johnson*, 276 Va. 356, 370 (2008) (emphasis added).

Here, Wesley improperly conflates his damages resulting from the alleged excessive force with separate causes of action for those same damages.  A claim for intentional infliction of emotional distress seeks "liability in tort for a *nontactile wrong*."  *Ruth v. Fletcher*, 237 Va. 366, 372 (1989) (emphasis added).  Wesley's claim of excessive force does not fall under the IIED umbrella under Virginia law.  To hold otherwise would allow Wesley impermissible double recovery for the same alleged damages. Thus, Officer Reed is entitled to summary judgment on Wesley's IIED claims.

**V.  The Officers are entitled to summary judgment on Wesley's assault and battery and gross negligence claims (Counts XVII, XVIII, XIX, and XX).**

Wesley' assault and battery claims rise and fall with his Fourth Amendment excessive force claims. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). For the reasons discussed above, each officer's use of force was reasonable under the circumstances and did not violate Wesley's Fourth Amendment rights. In any event, they are entitled to qualified immunity. Therefore, Wesley's assault and battery claims fail as a matter of law. *See Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) ("A legal justification for the act being complained of will defeat an assault or battery claim. Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties.").

Wesley' gross negligence claim similarly fails. A police officer enjoys "special protection" from tort liability when performing his duties in a lawful manner. *Bromwell v. Pankoke*, 2018 U.S. Dist. LEXIS 125076, at *18 (E.D. Va. July 25, 2018). "[I]n making an arrest under lawful authority, a police officer is within reasonable limits the judge of the force necessary under the circumstances, and he cannot be found guilty of any wrong, unless he arbitrarily abuses the power conferred upon him." *Parker v. McCoy*, 212 Va. 808, 813 (1972) (internal quotations and citations omitted); *see Njang v. Montgomery County*, 279 F. App'x 209, 216 (4th Cir. 2008) ("the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery and gross negligence").

Here, none of the officers acted "arbitrarily," nor did they act with a "complete neglect of the safety of another." *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987). The officers' actions would not "shock fair-minded" individuals. *Griffin v. Shively*, 227 Va. 317, 320 (1984). Officer Reed acted with the specific goal of getting Wesley to the ground so officers could safely arrest him. And Officers Rowland and Bryant used hands-on techniques to subdue Wesley while he

was actively resisting officer commands and handcuffing attempts.  All of the officers ceased force when Wesley was subdued.

Additionally, the officers are entitled to state law good faith immunity with respect to Wesley's tort claims.  Virginia courts recognize immunity in tort for alleged unlawful actions taken by police officers if the officers acted under a mistake of law, in good faith, and with a reasonable belief in the validity of their actions.  *De Chene v. Smallwood*, 226 Va. 475, 479-80 (1984).  As detailed above, the officers' use of force was reasonable under the circumstances according to the existing case law.  The defendant officers are entitled to immunity under federal and state law.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants City of Lynchburg, Virginia, Officer Seth Reed, Officer Austin Rowland, and Officer Collin Bryant respectfully request that the Court grant their motion for summary judgment and dismiss the Plaintiff's claims with prejudice.

> CITY OF LYNCHBURG, SETH REED, AUSTIN ROWLAND, and COLLIN BRYANT
>
> By /s/ John R. Fitzgerald
> Jim H. Guynn, Jr., Esq. (VSB # 22299)
> John R. Fitzgerald, Esq. (VSB # 98921)
> GUYNN WADDELL, P.C.
> 415 S. College Avenue
> Salem, Virginia  24153
> Phone: 540-387-2320
> Fax:    540-389-2350
> Email: jimg@guynnwaddell.com
>        johnf@guynnwaddell.com
> *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of December, 2023, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system.

M. Paul Valois
James River Legal Associates
7601 Timberlake Road
Lynchburg, VA 24502
Phone: (434) 845-4529
Fax: (434) 845-8536
Email: mvalois@vbclegal.com
*Counsel for Wesley*

Steven D. McFadgen, Sr.
McFadgen Law, PLC
3831 Old Forest Road, Suite 6
Lynchburg, VA 24501
Phone: (434) 385-4579
FAX: (888) 873-1048
Email: muchmorelaw@gmail.com
*Counsel for Wesley*

/s/ John R. Fitzgerald
Jim H. Guynn, Jr., Esq. (VSB # 22299)
John R. Fitzgerald, Esq. (VSB # 98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia  24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
            johnf@guynnwaddell.com
*Counsel for Defendants*