```
 1              A.   It was 2017.
 2              Q.   August 29th?
 3              A.   I don't know the exact date.  The
 4  year was 2017.
 5              Q.   All right.  Describe what happened
 6  with Calvin back then?
 7              A.   We were investigating a motor vehicle
 8  crash.  It was myself, Officer Collins, and then
 9  another officer, Tigress Clements, I believe was
10  her name.  We investigated a three-car crash on
11  Fort Avenue.  The -- one of the involved parties
12  fled from the scene, Mr. Wesley, he was later
13  identified as.
14              And then we ended up, Officer Collins
15  and I were riding together in a vehicle, and then
16  we ended up observing him on Kemper Street, right
17  near Kemper and Park, that traffic light.  We
18  conducted -- we got out with him, called it out on
19  the radio, attempted to identify him.  He ended up
20  fleeing from us.  He fled down Fort Avenue.
21              There's an alleyway.  There's
22  a -- it's currently, like there's a dance studio.
23  It's kind of like where the road V's, there's a
24  dance studio, now there's a couple of businesses,
25  like more going towards like 7-Eleven.  He ran in
```

```
 1  that alleyway.
 2              Then there was a concrete wall at the
 3  end of that alleyway.  He realized he had nowhere
 4  to go.  He turned and faced me, and then that's
 5  when I went hands-on with him.  At that point,
 6  Officer Collins had not caught up to where we were.
 7  We ended up fighting.  We went from the wall, like
 8  he was initially trying to pull away from me.  We
 9  ended up going to the ground.  Once when we were on
10  the ground, I could not get him in handcuffs at
11  all.
12              I ended up having him -- I was like
13  on my back, he was more so on my chest.  That's
14  when he -- the first time he grabbed my genitals.
15  He started pulling all my genitals at that point,
16  trying to get me, I guess to let --
17       Q.     By genitals do you mean your
18  testicles?
19       A.     My testicles, yes, sir.
20              I still did not let go of him at that
21  point, and then I felt a tugging at my taser.  He
22  had his hand like right around the handle of my
23  taser, trying to pull my taser out of the holster,
24  which I at that point yelled to Officer Collins,
25  who was with me at this point.  I instructed her,
```

```
 1   "He's trying to disarm me.  He's trying to pull my
 2   taser."  I don't remember exactly what I said.
 3              She ended up deploying her taser on
 4   Mr. Wesley, which was not effective.  We ended up
 5   going hands-on with him again.  At some point
 6   during the scuffle, I don't remember exactly when,
 7   he ended up having my fingers, my left hand, inside
 8   of his mouth.  He was biting my fingers.  He ended
 9   up grabbing my genitals, my testicles again.
10              And then we maintained control of him
11   until more officers arrived.  And it took multiple
12   officers before we could actually place him in
13   handcuffs.
14         Q.   Did he break the skin on your
15   fingers?
16         A.   Yes, sir.  I have scars on my
17   fingers.
18         Q.   And did you -- you required medical
19   treatment?
20         A.   Yes, sir.
21         Q.   Was the other officer injured?
22         A.   Yes.
23         Q.   What's the other officer's name?
24         A.   Jenna Collins.
25         Q.   And he was arrested?
```

```
 1          A.    Yes, sir.
 2          Q.    So were you given leave for that?
 3          A.    I was not.
 4          Q.    Well, was that traumatic for you?
 5          A.    A little bit, yes, sir.
 6          Q.    Were you ever counseled for it?
 7          A.    I was not.
 8          Q.    It's kind of stuck with you?  You
 9    mentioned those incidents on body cam during both
10    of the more recent incidents; right?
11          A.    Yes, sir.
12          Q.    Well, that had to make you angry?
13          A.    What's that?
14          Q.    No man gets his testicles grabbed and
15    pulled without being angered; right?
16          A.    I wasn't very happy, no.
17          Q.    All right.  And it doesn't -- it had
18    to make you angry to get your fingers bit; right?
19          A.    Again, I don't like -- no one likes
20    getting injured.
21          Q.    Right.  Well, were you angry then?
22          A.    I don't recall exactly how I felt
23    back in 2017.
24          Q.    You still angry now?
25          A.    No.
```

```
 1              Q.    You didn't have any desire to
 2   retaliate?
 3              A.    No.
 4              Q.    On November 13th of 2018, there was
 5   another incident involving Brandon Clark?
 6              A.    Yes, sir.
 7              Q.    Did you know Brandon Clark?
 8              A.    Yes.
 9              Q.    Is he still in Appomattox?
10              A.    Yes, sir.
11              Q.    At the time he was an LPD officer;
12   right?
13              A.    Yes, sir.
14              Q.    Do you know why he left the force?
15              A.    He had family -- I don't exactly
16   know.  I knew it was family issues.  And then he
17   ended up moving to Texas, and then they moved back,
18   and then he got hired on with Appomattox.  But I
19   believe it was because of his family.
20              Q.    Right.  And he told you that Calvin
21   hit him in the face; is that right?
22              A.    I don't recall exactly what he told
23   me.
24              Q.    Do you remember telling other people
25   that Calvin hit him in the face?
```

```
 1            A.    I know that they had physically
 2   fought.
 3            Q.    Specifically hitting in the face, do
 4   you -- that you had any information that on
 5   November 13th of 2018 that Calvin Wesley hit
 6   Brandon Clark in the face?
 7            A.    I know they physically fought, but I
 8   don't -- I can't say under oath that I told people
 9   that he got punched in the face.  I don't know
10   that.  I can't say what I said back then.  I can't
11   say that.
12            Q.    Well, let's break this into two
13   different --
14            A.    Okay.
15            Q.    -- let's break this into two
16   different parts.
17                  First of all, do you have any
18   information that that happened, that he hit Brandon
19   Clark in the face?
20            A.    I know they got into a fight, yes,
21   sir.  I don't know --
22            Q.    Well, getting into a fight is a
23   different -- that's the answer to a different
24   question, whether they got into a fight.
25            A.    Okay.
```

1  Q. The question, specific question, I
2  have is do you have any information that during any
3  fight, Calvin Wesley hit Brandon Clark in the face?
4  A. I can't say that I was physically
5  told by Brandon Clark that he was punched in the
6  face by Calvin.
7  Q. Were you told by anyone else that he
8  was punched in the face by Calvin Wesley?
9  A. I know that I've been told by Officer
10 Godsie, because Officer Godsie was there, that they
11 physically fought. But I cannot say under oath
12 whether or not he was -- I was told that he was
13 punched in the face.
14 Q. By anyone?
15 A. Correct.
16 Q. All right. Well, then why would you
17 tell other people that he was punched in the face?
18 Why would you tell your supervisors at the scene of
19 this incident that Calvin Wesley had punched
20 Brandon Clark in the face?
21 A. I'm not -- I don't know.
22 Q. Okay. Now, Calvin was convicted of
23 assaulting you in 2017, and another officer.
24    Would that be the one you mentioned
25 that was with you?

```
 1         A.    Officer Collins, yes, sir.
 2         Q.    Okay.  He was convicted of both of
 3  those charges, and he did a year on those; right?
 4         A.    I don't know how much time he did.  I
 5  don't know how much time he served on those.
 6         Q.    But the charge against assaulting
 7  Brandon Clark was -- the prosecutors ended up
 8  dropping that charge.
 9               Were you aware of that?
10         A.    I'm not aware of that.
11         Q.    All right.  Have you ever known
12  Calvin to be armed?
13         A.    No.
14         Q.    In fact, he has a felony record for
15  some theft crime in the 2000s.
16               Are you aware of that?  You ever run
17  his record?
18         A.    I haven't.
19         Q.    Well, you're aware he's a felon?
20         A.    Yes.  I know he's a felon.
21         Q.    And in Virginia felons are not
22  allowed to --
23         A.    Possess firearms.
24         Q.    -- possess or transport a firearm; is
25  that correct?
```

```
 1            A.    Yes, sir.
 2            Q.    Okay.  He's never been armed during
 3   any of your previous encounters?
 4            A.    Correct.
 5            Q.    And you're not aware of any criminal
 6   weapons convictions that he's ever had?
 7            A.    I am not.
 8            Q.    Okay.  All right.  Let's see, where
 9   are we?  Let's move on to the incident on Grace
10   Street that occurred on March 11th, 2021.
11            A.    Okay.
12            Q.    That occurred at about 1:13 p.m.
13                  Does that sound right?
14            A.    Yes, sir.
15            Q.    The weather was clear?
16            A.    Correct.
17            Q.    All right.  How did you end up
18   responding there?
19            A.    I self-dispatched.  So the call was
20   dispatched, meaning so all of our -- most of our
21   radio traffic is dispatched over the air, so they
22   dispatched three officers to the warrant.
23   Certain -- so in our local system, Pistol, certain
24   individuals, they have alerts.
25                  So they have officer safety alerts,
```

```
 1  send three, known to arrest, whatever, assault
 2  on -- all the alerts in our system.  So they
 3  dispatched three.
 4                 Typically when multiple units are
 5  dispatched, I'll look up, I'll pull up the case to
 6  see who the involved individual was.  And then when
 7  I observed that it was Mr. Wesley, then I
 8  dispatched myself to the case and then met up with
 9  the officers involved.
10          Q.     Okay.  Nobody asked you to respond?
11          A.     No.
12          Q.     And nobody asked you to bring a dog
13  with you?
14          A.     Correct.
15          Q.     I'm going to come back to the whole
16  K-9 part after we do the --
17          A.     Okay.
18          Q.     -- incident.
19                 So the -- you -- why did you choose
20  to respond to that particular case?
21          A.     Because I have one tool on our shift
22  that nobody else has.  I'm a K-9 officer.
23          Q.     And why did you elect to bring the
24  K-9?  Why did you choose to respond with the K-9 to
25  the scene that day?
```

```
 1            A.    For officer safety.
 2            Q.    All right.  So when you came there,
 3    you weren't expecting to use the dog for tracking
 4    or anything?
 5            A.    I don't know what I was anticipating
 6    using the dog for.
 7            Q.    Well, I'm asking you what you
 8    anticipated using the dog for?
 9            A.    I didn't anticipate using the dog.  I
10    just had the dog there in case we needed to utilize
11    the K-9.
12            Q.    All right.  Well, I'm sorry, maybe I
13    misunderstood, but when I asked you why you
14    responded there, you said because you were the only
15    one that had that resource?
16            A.    Correct.
17            Q.    So the why is because you had the
18    dog; right?
19            A.    Yes, because I'm a K-9 officer.
20            Q.    Right.  So why would you elect to
21    bring the dog there is my question?
22            A.    For --
23            Q.    Why did you feel the need to bring
24    the dog?
25            A.    For officer safety reasons.
```

```
 1          Q.    To use --
 2          A.    Because Mr. -- I'm sorry.
 3          Q.    Oh, go ahead.
 4          A.    Just due to Mr. Wesley having a
 5   history with fighting the police.
 6          Q.    So you brought the dog there in case
 7   you needed to use it against Mr. Wesley?
 8          A.    Brought the dog there in case
 9   Mr. Wesley decided to fight the police, yes, sir.
10          Q.    And then in that case, to use, to
11   deploy the dog?
12          A.    If he fought the officers, yes, sir.
13          Q.    Well, let me go back.
14                Your dog has multiple capabilities;
15   right?
16          A.    Yes, sir.
17          Q.    It has drug -- it does tracking,
18   certified in tracking?
19          A.    Yes, sir.
20          Q.    It's certified in drug detection?
21          A.    Yes, sir.
22          Q.    Certified in anything else?
23          A.    Area searches, article searches,
24   building searches.  So he's a narcotics patrol dog.
25   He's dual purpose.
```

```
 1              Q.   So my question to you is you weren't
 2   bringing him there for any of those purposes?
 3              A.   I was bringing him there for officer
 4   safety reason.
 5              Q.   Okay.  But to be clear, because I'm
 6   trying to make a record here; all right?  My
 7   question to you is you were not bringing him there
 8   for any drug detection purposes?
 9              A.   Correct.
10              Q.   You weren't bringing him there for
11   any search function?
12              A.   Correct.
13              Q.   And you weren't bringing him there to
14   try and track down a subject?
15              A.   Yes, sir, correct.
16              Q.   Correct?  Okay.
17                   So you got there.  As you got there,
18   you parked your car and removed the dog
19   immediately?
20              A.   Yes, sir.
21              Q.   And took the dog with you; right?
22              A.   Yes.
23              Q.   And your dog's name is Knox; is that
24   right?
25              A.   Yes, sir.
```

```
 1          Q.   And so you took Knox -- you parked on
 2   a side street and then took Knox to Grace Street;
 3   is that right?
 4          A.   Yes, sir.
 5          Q.   At which point you saw Calvin getting
 6   into the passenger side of a truck?
 7          A.   Yes, sir.
 8          Q.   And that truck belonged to his
 9   landlady?
10          A.   Yes.
11          Q.   Okay.  And he said he was going with
12   her to do some sort of work?  Do you remember?
13          A.   I don't remember what he --
14          Q.   The reason, the warrant that was
15   outstanding was a misdemeanor warrant?
16          A.   Yes, sir.
17          Q.   Did you know what the warrant was for
18   before you went out there?
19          A.   Yes, sir.
20          Q.   Okay.  What was it for?
21          A.   It was an assault and battery
22   warrant.
23          Q.   A domestic misdemeanor assault and
24   battery warrant?
25          A.   Yes, sir.
```

```
 1  you there?
 2          A.   We were dispatched to -- I believe
 3  the initial call was a disorderly call.
 4          Q.   Disorderly call at that particular
 5  apartment number?
 6          A.   Yes, sir.
 7          Q.   All right.  And in this one, did you
 8  self-dispatch or did you dispatch on your own?
 9          A.   I'm not sure.
10          Q.   It was a domestic disturbance call,
11  and when you got there, were you aware of any
12  outstanding warrants for Calvin Wesley at that
13  time?
14          A.   Yes, sir.
15          Q.   All right.  Had that come over
16  dispatch?
17          A.   Yes.
18          Q.   Did you look that up in that Pistol
19  thing?
20          A.   I'm not sure if I did or not.
21          Q.   Or were there notes given?
22          A.   There was notes in CAD.
23          Q.   All right.  Isn't it true that those
24  notes were not for Calvin Wesley, but for Kelvin
25  Wesley?
```

1  then that's where we were advised that he had a
2  warrant.
3            We had another officer call the
4  complaint desk, or he had dispatch call the
5  complaint desk, verify the warrant. That was
6  verified. We could not locate him. So myself and
7  another officer canvassed the area looking for
8  Mr. Wesley, because he left. According to the
9  caller, he had left the area on foot.
10           Q.  Right. And then what'd you do?
11           A.  Then I ended up seeing him.  I
12  checked the apartment complex across from Old
13  Forest Road. I observed him walking down Anthony
14  Place from Old Forest Road. I got on the radio,
15  notified the other officer that I observed the
16  suspect, who Ms. Wesley had given us a pretty good
17  suspect description of Mr. Wesley, what he was
18  wearing. I observed him walking down. We called
19  it out over the radio, and then made approach on
20  foot.
21           Q.  To where?
22           A.  I believe it was Apartment 26 or
23  36.
24           Q.  Okay.
25           A.  So we were like -- so it's like 18,

```
 1   and then he was walking down and standing on the
 2   front porch of an apartment building that we
 3   observed, and then we approached on foot.
 4           Q.   Okay.  So you approached another
 5   apartment, and you had received -- you encountered
 6   an individual standing outside that apartment;
 7   right?
 8           A.   Yes.
 9           Q.   And that individual said that Calvin
10   Wesley was a friend of his, and he had gone into
11   that apartment?
12           A.   Yes.
13           Q.   And from there you ascertained he
14   jumped out of a window?
15           A.   Yes.
16           Q.   And that window would have been in
17   the back of that apartment?
18           A.   Yes, sir.
19           Q.   And that's trending downhill at that
20   point?
21           A.   Yes, sir.
22           Q.   Is this an apartment where the front
23   of the apartment is at ground level, but the back
24   of the apartment is above ground level?
25           A.   Yes, sir.
```