



| *WRITTEN DIRECTIVE* | No. PD21-0602 | Page: 1 of 20 |
|---|---|---|
| Subject: **USE OF FORCE** | Effective Date: | 01-13-21 |
| | Supersedes/ Amends: | PD20-0602 |
| | Reference: | 1.3.1-8, 1.3.12, 1.3.13, 46.1.4, 41.1.4 |

## I.   Purpose

*1.3.2*

The purpose of this directive is to establish guidelines concerning the authorization, implementation, investigation and documentation of the use of force by officers of the Lynchburg Police Department.

## II.   Policy

*1.3.1 / 1.3.12*

It shall be the policy of the Lynchburg Police Department to value and preserve human life. Officers shall use only that force objectively reasonable to effectively maintain order and control of an incident, while protecting the safety of the officer and others. Officers will use force only when all other viable options have been attempted or no reasonably effective alternative appears to exist. If force must be used, officers shall use only the level of force that a reasonably prudent officer would use under the same or similar circumstance.

## III.   Procedure

### A.   GENERAL

1.   For the purposes of this directive *use of force* will encompass both deadly and non-deadly force.

   a.   Officers should take in to consideration the Graham v. Connor case when deciding on force application. These factors are:

   1)   severity of the crime

   2)   threat to the officer or others

   3)   is the suspect actively resisting arrest or attempting to evade arrest by fleeing from the officer

   b.   Officers will utilize force in accordance with Lynchburg Police Department training and as deemed reasonably necessary to accomplish lawful police objectives.

   c.   Deployment of police canines and tire deflation devices will be considered use of force incidents.

    d.   Whenever possible, officers will employ de-escalation techniques when confronted with situations that require the use of force.

2.   For the purposes of this directive, the following definitions will apply:

*1.3.2*

    a.   Deadly force:  Any use of force that creates a substantial risk of causing death or serious bodily injury.

    b.   Non-deadly force:  Any use of force that does not create a substantial risk of causing death or serious bodily injury.

    c.   De-escalation: Taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation. The goal of de-escalation is to gain the voluntary compliance of subjects, when feasible, and reduce or eliminate the necessity to use physical force, but not at the sacrifice of officer safety.

    d.   De-escalation Techniques: Actions used by officers that seek to minimize the likelihood of the need to use force during an incident, and increase the likelihood of gaining voluntary compliance from the subject.

    e.   Reasonable belief: When facts or circumstances the officer knows, or should know, are such to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

    f.   Serious physical injury: A bodily injury that:

       1)   creates a substantial risk of death, or

       2)   causes serious, permanent disfigurement, or

       3)   results in long-term loss or impairment of any bodily member or organ.

    g.   Physical Force: Bodily force exceeding the normal force required to take a person into custody:

       1)   any combination of strength, leverage, take-downs, control or come-along holds used to gain control of an uncooperative person; or

       2)   the use of hands, fists, feet, knees, etc. in striking a person.

*1.3.2 / 1.3.12*

3.   An officer may use deadly force *only* when the officer reasonably believes that the action is:

    a.  in defense of human life, including the officer's life, or

    b.  in defense of any person in imminent danger of serious physical injury, or

    c.  in the apprehension of a fleeing felon, when:

        1)  the officer reasonably believes that the suspect's freedom represents a significant immediate threat of serious physical injury or death to the officer or to other persons; and

        2)  the officer has probable cause to believe that a felony has been committed and the person to be arrested has committed it; and

        3)  the officer has identified himself as a police officer, and given notice of his intention to arrest (time and circumstances permitting); and

        4)  all other reasonable means of apprehension have been exhausted before deadly force is used.

    d.  a direct command of a police supervisor with knowledge potentially unknown to the officer, typically in the event of a critical incident.

4.  Regarding use of non-deadly force, an officer may employ any level of force reasonably necessary in order to:

    a.  defend the officer or another person, or

    b.  subdue a person resisting arrest, or

    c.  prevent escape from custody.

5.  An officer will notify his immediate supervisor as soon as practical after an incident involving the use of force.

*1.3.5 / 1.3.12*

6.  Appropriate medical assistance will be summoned to render medical aid as quickly as reasonably possible following any law enforcement action in which injuries or a complaint of injury to a person occurs, or any time a person who is the subject of a use of force asks for medical assistance.

    a.  The involved officer(s) will notify LynComm that medical aid is needed and will provide a brief description of the symptoms and type of injury involved.

    b.  LynComm will dispatch emergency medical personnel to treat the injured person.

CITY 000573

  c. Until medical assistance is available, the officer(s) will monitor the involved person closely to detect any changes in physical condition and render first aid within the limits of their training and the equipment available.

*1.3.4*

 B.  <u>USE OF CHEMICAL SPRAY</u>

  1. Chemical spray (OC Spray, or other issued equipment) may be used as a means of:

   a.  physical restraint or control, or

   b.  defense of any person.

  2. Once a person is restrained and under control, the use of chemical spray is no longer justified.

  3. In cases where chemical spray does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

  4. Chemical spray will not be used for the following:

   a.  as a threat to make a person comply with an officer's verbal order:

    1)  in a non-arrest situation, or

    2)  when no physical threat or violence appears imminent

   b.  to elicit information from a person

   c.  as retaliation for verbal or physical abuse.

*1.3.5*

  5. A person who has been sprayed with a chemical spray:

   a.  will be allowed to flush the affected area with water as soon as practical after the incident; and

   b.  will be informed by the officer involved that medical attention is available, at their own expense, if they so desire.

 C.  <u>USE OF TASER</u>

  1. May be used as a means of:

   a.  physical restraint or control, or

   b.  defense of any person.

2.   Once a person is restrained and under control, the use of the Taser is no longer justified.

3.   In cases where the Taser does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

4.   The Taser will not be used for the following:

   a.   as a threat to make a person comply with an officer's verbal order:

      1)   in a non-arrest situation, or

      2)   when no physical threat or violence appears imminent

   b.   to elicit information from a person

   c.   as retaliation for verbal or physical abuse.

   d.   on any person that does not raise a risk of immediate danger.

*1.3.5*

5.   When the Taser is utilized on a person:

   a.   Officers who have been trained in the removal of probes by a certified Taser instructor will be authorized to remove the probes from non-sensitive areas of the body (described as any area other than the head, neck, breast, or groin).

      1)   Officers will have Lynchburg Fire Department personnel respond and perform a basic patient assessment to ensure the person is medically stable.

      2)   If the probes are located in a sensitive area (described as the head, neck, breast, or groin), the affected person will be transported to the Lynchburg General Hospital Emergency Department.  Appropriate medical staff will then remove the probes.

      3)   The affected person will be informed by the officer that additional medical attention is available, at the person's own expense, if they desire to receive such attention.

      4)   The officer will photograph the affected area before and after probe removal.

   b.   The officer will place the removed probes in the wire pockets of the Taser cartridge and then place the cartridge in a container marked with a biohazard label. This container is to be then placed in the property/evidence system.

    c.   The probes will be maintained within the evidence system for a minimum period of four years from date of deployment.

  6.  Supervisors will document any accidental discharge of a Taser that does not constitute a use of force against another person in Blue Team under *Firearm Discharge*.

**1.3.4/1.3.6 D**

  D.  <u>USE OF PHYSICAL FORCE</u>

  1.  Officers will use only such force as is reasonably necessary to effect lawful objectives.

  2.  Physical force may be used as a means of:

    a.   physical restraint or control, or

    b.   subduing a person resisting arrest, or

    c.   defense of any person, or

    d.   moving, removing or arresting any person who is obstructing a lawful police action in such a manner that the police action cannot be accomplished.

  3.  Officers are not trained nor authorized to use neck restraints or choke holds of any kind except as deemed necessary in a situation where use of deadly force is justified.

  4.  Once a person is restrained and under control, the use of physical force will be restricted to that force necessary to retain control.

  5.  In cases where physical force does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

  6.  Due to the possibility of positional asphyxiation, handcuffed persons should not be left lying face down.

    a.   Handcuffed persons should be put into the sitting position or lying on their side position as soon as possible.

    b.   Positional asphyxiation is of even greater concern for persons who have consumed drugs or alcohol.

  7.  Physical force will not be used for the following:

    a.   as a threat to make a person comply with an officer's verbal order:

1) in a non-arrest situation, or

2) when no physical threat or violence appears imminent

b. to elicit information from a person

c. as retaliation for verbal or physical abuse.

*1.3.4*

E. <u>USE OF POLICE BATON</u>

1. The issued baton is authorized as a means of:

a. physical restraint or control, or

b. defense of any person.

2. All officers will have the department-issued police baton accessible while on regular duty assignment.

a. Uniformed officers will have the baton on their person while on duty.

b. All other officers will be required to have the baton accessible at the Police Department or within their assigned vehicle.

c. Uniformed officers involved in approved off-duty employment will have the baton on their person.

3. Officers should avoid intentionally striking any person in or about the head with the baton, except as deemed necessary in a situation where use of deadly force is justified.

4. Once a person is restrained and under control, the use of the baton is no longer justified.

5. In cases where the baton does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

6. The baton will not be used for the following:

a. the intentional striking of any person who is under control by an officer, or

b. as a threat to make a person comply with an officer's verbal order:

1) in a non-arrest situation, or

2) when no physical threat or violence appears imminent

    c.   to elicit information from a person

    d.   as retaliation for verbal or physical abuse.

F.   <u>USE OF 40mm SINGLE LAUNCHER</u>

   1.  The use of the 40mm single launcher is authorized as a means of:

    a.  distraction or disarming of an individual, or

    b.  defense of any person, or

    c.  civil disturbance or riot control.

   2.  All officers authorized to utilize the 40mm single launcher will be responsible for checking it out prior to their tour of duty and returning it at the conclusion of their tour of duty.

    a.  40mm single launchers will be stored and secured in the PD basement gun cabinets, located near the K9 office.

    b.  40mm single launchers will be secured in the trunk of the assigned officer's patrol vehicle during his or her shift.

   3.  Once a person is restrained and under control, the use of the 40mm single launcher is no longer justified.

   4.  In cases where the 40mm single launcher does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

   5.  The 40mm single launcher will not be used for the following:

    a.  as a threat to make a person comply with an officer's verbal order:

      1)  in a non-arrest situation, or

      2)  when no physical threat or violence appears imminent

    b.  to elicit information from a person, or

    c.  as retaliation for verbal or physical abuse.

G.   <u>USE OF FIREARMS</u>

CITY 000578

1. For the purposes of this directive, the word firearm shall refer to any handgun, or shoulder-fired weapon issued by the department, authorized for concealed carry by the department, or used by an officer for any law enforcement purpose.

2. Officers will be authorized to draw and/or display firearms when in fear for their own safety or the safety of other persons (e.g. building searches, confronting persons believed to be armed or dangerous, etc.). Officers will be prepared to justify un-holstering a firearm in terms of a potential safety threat.

3. Once a person is restrained and under control, or reasonable belief of a threat no longer exists, the officer shall immediately cease pointing the firearm at the person.

4. Officers will be authorized to discharge a firearm for the following purposes:
   a. as outlined in Section III.A.3

   b. to kill a seriously injured animal, when:

      1) no other disposition is practical, and

      2) the officer deems it appropriate to relieve the animal from further suffering (authorization should be obtained from a supervisor if time permits)

   c. to kill an animal that poses a danger to the officer or to the public

   d. department training and qualification

   e. department approved test firing.

5. Whenever possible, a verbal warning should be given prior to discharging a firearm.

*1.3.3 / 1.3.12*   6. Officers are prohibited from discharging a firearm for the purpose of a warning shot.

7. Discharging a firearm at or from a moving vehicle is authorized *only* when:

   a. any occupant of the suspect vehicle is using, or threatening to use, deadly force by a means other than the vehicle; *or*

   b. a vehicle is being operated in a manner indicating *deliberate intent* to strike an officer or another person; *and*

CITY 000579

c.   all other reasonable means of defense have been exhausted or are not available (including moving out of the path of the vehicle); *and*

d.   the safety of innocent persons will not be unduly jeopardized by the officer's action.

8.   Officers faced with the possible necessity of discharging a firearm should remain cognizant of the following:

   a.   the direction in which the firearm is to be discharged; and

   b.   that the target threat is in plain view and that the target threat is identified; and

   c.  the danger inherent in discharging a firearm while running or moving, due to the possibility of unintended persons or property being struck by projectiles.

*1.3.6 A*
*1.3.6 A*

9.   Reporting discharge of firearms:

   a.   On-duty officers will verbally report to their supervisor and off-duty officers will verbally report to the on-duty Watch Commander the following:

      1)   any discharge of a firearm constituting use of deadly force against another person (on or off duty); or

      2)   any accidental discharge of a department issued or a department authorized firearm (on or off duty); or

      3)   on-duty discharge of any firearm for any purpose other than department-sanctioned training.

   b.   Such verbal report shall be made as soon as incident circumstances permit.

   c.   Supervisors will document in Blue Team a Use of Force incident involving any discharge of a firearm that constitutes use of deadly force against another person.

   d.   Pursuant to the Code of Virginia 52-28.2, the Professional Standards Unit will report to the Virginia State Police (VSP) electronically (www.va.beyond2020.com) all Use of Force incidents that result in the death of or serious bodily injury to a person, or when a firearm is discharged by a law enforcement officer in the direction of a person.

   e.   Supervisors will document any accidental discharge of a department issued or department authorized firearm that does not constitute use

of deadly force against another person in Blue Team under Firearm Discharge.

    f.   Officers will complete an Incident Report to document discharge of a firearm related to the killing of a wild or a domesticated animal.

    g.   In addition to the Incident Report, Supervisors will document Use of Force cases in Blue Team where an animal is killed while attacking or actively threatening a person.

*1.3.4*

    H.   <u>USE OF OTHER WEAPONS</u>

    1.   Only those officers who have been trained in the proper use of such weapons will be authorized to use them.

    2.   Chemical agents, such as CS gas and chemical smoke, may be used by an officer whether or not the officer effects an arrest for purposes of:

        a.   crowd control, or

        b.   concealment, or

        c.   the evacuation of a barricaded subject.

    3.   Flash/sound devices may be used by an officer, whether or not the officer effects an arrest, for creating a diversion which is intended to conceal a specific tactical maneuver from the suspect.

    4.   An officer's use of any item not specifically mentioned within this directive as a weapon will be for defensive purposes only.

*1.3.4 / 41.1.4 A*

    I.   <u>USE OF POLICE CANINES</u>

    1.   Use of police canines will be in accordance with guidelines set forth in directive PD-0706 (*Departmental Canine Teams*).

    2.   Police canines may be used as a means of:

        a.   physical restraint and control; or

        b.   apprehending or subduing a person resisting arrest by fleeing or physical actions; or

        c.   defense of any person.

CITY 000581

3.  Police canines used by the LPD will be trained to utilize force in apprehending and retaining control of persons, until the K9 handler deems it safe to recall or remove the police canine.

4.  Officers will be mindful that any use of police canines in which the canine is not under the handler's physical or voice control may potentially be considered a use of deadly force.

5.  In cases where the use of a police canine does not prove effective, officers should utilize other use of force options as necessary for restraint or control.

6.  Police canines will *not* be used for the following:

    a.  as a threat to make a person comply with an officer's verbal order:

        1)  in a non-arrest situation, or

        2)  when no physical threat or violence appears imminent

    b.  to elicit information from a person

    c.  as retaliation for verbal or physical abuse.


J.  USE OF TIRE DEFLATION DEVICES

    1.  Use of tire deflation devices will be in accordance with directive PD-0702 (*Vehicle Pursuit*).

    2.  Tire deflation devices will be used in a pursuit situation when the pursuing officer or supervisor has reason to believe that the continued movement of the fleeing vehicle will place the driver and/or others in imminent danger of serious bodily harm or death.

K.  USE OF FORCE INCIDENT REPORTING

    1.  Duty to Intervene

        a.  Sworn employees should take appropriate actions to protect the public and other employees whenever possible.

        b.  It shall be the duty of every sworn employee present at any scene where physical force is being applied to either stop or attempt to stop another sworn employee when force is being inappropriately applied or is no longer required.

    2.  Employee Duty to Report:

a.  It shall be the duty of every sworn employee who observes or
intervenes with another sworn employee using force that exceeds the
degree of force permitted by law to promptly report these observations
to a supervisor.

b.  Involvement in a use of force incident will not preclude or override an
employee's responsibility as a City and Police Department employee
to accurately, fully and promptly report work-related activities and
observations.

c.  Employees will verbally report incident details:

1)  to other employees, representatives of other agencies or
members of the public as and when necessary to:

a)  safeguard human life, aid in suspect apprehension, or
otherwise further an ongoing investigation; and

b)  fully cooperate and assist in reporting on an incident deemed
likely to give rise to a claim against the City of Lynchburg

2)  upon direct order of any Lynchburg Police Department
supervisory staff member.

d.  Employees will complete all procedurally-required written
administrative reports, statements, memoranda, etc. on supervisory
direction as soon as practical after incident occurrence.

e.  An employee who deliberately refuses to provide verbal and/or written
incident information when ordered to do so:

1)  will be subject to disciplinary action, up to and including
termination of employment, for insubordination; and

2)  may have City insurance coverage summarily limited or
terminated.

f.  The on-scene supervisor will assign another employee to complete
any required report that the involved employee is physically unable to
complete in a timely manner.

g.  The on-scene supervisor will complete any required administrative
report that the involved employee is physically unable to complete in a
timely manner.

h.  In cases where such reports were completed for an incapacitated
employee, that employee will review the reports for accuracy as soon

as practical thereafter, and will correct any errors noted through filing a supplement to the original report.

**1.3.6 A & C**

3.  Supervisors will document a *Use of Force* incident in Blue Team to provide internal administrative documentation of incidents involving:

    a.  use of chemical spray

    b.  deployment of the Taser

    c.  use of physical force in any situation involving:

        1)  visible injury, or complaint of injury, to a suspect or arrestee

        2)  visible injury, or complaint of injury, to an involved officer

        3)  damage to non-department owned property resulting from use of physical force to apprehend, restrain or control a suspect or arrestee. Use of force to enter a structure or vehicle will be documented by means of an incident report rather than Use of Force reporting through Blue Team.

        4)  officers having any form of physical contact with a suspect or arrestee under the circumstances specified above will notify their supervisor, who will document the officers' actions as a Use of Force in Blue Team. Other officers assisting post application of force will be listed as witnesses in the Blue Team report.

    d.  use of the police baton

    e.  use of the 40mm single launcher

    f.  certain discharges of firearms (see III.F.7 *Reporting discharge of firearms*)

    g.  use of other weapons

**1.3.6 B**

    h.  use of police canines in which the canine contacts a person

    i.  use of tire deflation devices

    j.  any use of force that either results in, or is alleged to have resulted in, death or serious physical injury to a person

    k.  any situation that a supervisor directs be documented by a Use of Force form

CITY 000584

4.   Officers will report to a supervisor a factual account of the type and level of force utilized by LPD officers in any use of force situation as specified above. Officers will not include information derived from either personal opinion or speculation.

5.   Officers will complete a report to document any observed use of force by non-LPD personnel in the following situations:

   a.   other law enforcement agencies assisting LPD officers

   b.   LPD officers assisting other law enforcement agencies

   c.   assisting or being assisted by private sector employees (security agencies, loss prevention, etc.)

   d.   citizens assisting officers.

*1.3.7*

6.   The City Attorney has requested that Use of Force documentation be considered as Attorney Work Product documentation, as this information is used to assist the City Attorney in evaluating any related claims against the City.

7.   Attorney Work Product documents will be handled with the utmost confidentiality, and will <u>not</u>:

   a.   be copied without prior authorization by the Chief of Police

   b.   be forwarded through the report review process

   c.   be filed within the Records Unit

   d.   be discussed with or delivered to anyone other than those persons named in this directive without prior authorization by the Chief of Police.

8.   Supplementary and follow-up information to a Use of Force incident will be attached to the Use of Force investigation in Blue Team.

9.   Incident reports and supplement reports related to the use of force will not be considered as Attorney Work Product documentation.

   a.   Incident reports and supplement reports should not include detailed information concerning an officer's use of force.

   b.   For purposes of courtroom testimony, Incident Reports and supplement reports should include detailed, factual information to establish all elements of the related crime and to describe suspect actions that led to an officer's use of force.

    c.   Incident Reports and supplement reports will be submitted to the Report Review Office for classification.

    d.   Incident Reports and supplement reports will be filed by control number according to Records Unit procedure.

    e.   Copies of Incident Reports and supplement reports will be attached to the Use of Force investigation as supplemental information in Blue Team.

L.   <u>USE OF FORCE INCIDENT INVESTIGATION</u>

    1.   Supervisory investigation of Use of Force incidents will be conducted in accordance with guidelines set forth within directive PD1601 (Internal Investigations).

       a.   All investigations will be completed by a Sergeant, Lieutenant, Captain, or a designated supervisor.

       b.   All completed Use of Force investigations will be reviewed by a Lieutenant not involved in the incident or the Use of Force investigation.

*1.3.7*

    2.   The supervisor investigating a Use of Force will:

       a.   verify the information related on the Use of Force

       b.   factually complete through Blue Team reporting the Use of Force investigation with a summary of the facts of the incident

       c.   sign, date, and submit the completed Use of Force investigation as soon as practical (and within 42 days unless formal, written approval is obtained from the Chief of Police) of the Use of Force incident.

          1)   Each supervisory level will:

             a)   review the Use of Force investigation and any related investigatory materials for completeness and policy compliance for the act reported through Blue Team

             b.   ensure that the investigatory documentation accurately reflects the action(s) taken by the suspect(s) and involved officer(s)

             c)   sign and date the investigation on approval

> d) submit the investigation to the next level in the chain of command through Blue Team within 7 days unless formal, written approval is obtained from the Chief of Police.

*1.3.6 B*

M. <u>USE OF FORCE RESULTING IN DEATH, SERIOUS INJURY, OR SIGNIFICANT PROPERTY DAMAGE</u>

1. At any time that an officer's use of force (on or off duty) results in, or is alleged to have resulted in, the death of any person, the serious physical injury of any person, significant damage to non-LPD property, or other circumstances or effects deemed likely to foster significant public interest or concern, that officer will be responsible for:

   a. immediately notifying the senior on-duty supervisor; and

   b. securing the incident scene and safeguarding persons present until relieved after the arrival of assisting officers; and

   c. preserving, as practical, any firearm or other weapon used from loss or tampering.

2. If the use of force incident occurs in another jurisdiction, the employee shall immediately notify the local agency having law enforcement jurisdiction prior to making LPD supervisory notification.

3. Once the incident scene is secure and the involved officer has been escorted from the scene to the police department, the officer will relinquish:

   a. any discharged firearm, the firearm holster (in cases of accidental discharge), and all ammunition in the officer's possession

      1) Except under extenuating circumstances, i.e. if an officer's duty belt needs to be removed due to significant injury, the involved officer will not relinquish his or her handgun while on scene of the incident.

   2) An involved officer's supervisor shall not "swap out" his or her handgun for the purpose of procuring the involved officer's weapon while on scene. All relinquishing of kept firearms will take place at the police department away from the scene.

   b. any weapon used by the officer. If the weapon is separated from the officer on scene, it should remain in place for crime scene processing.

   c. any equipment, clothing, or other items deemed necessary by the responding supervisor.

      1) Officers should remain clothed until pictures can be taken of the officers by the investigating agency.

2)  Exception is if an officer is exposed to a bio-hazard, then the officers' clothing should be removed expeditiously when arriving at the police department.

4.  Such use of force situations will be responded to, handled and reported according to procedures set forth within PD-0402 (*Significant Incident Management*).

5.  An officer who has relinquished a weapon utilized in a Use of Force incident will be issued a replacement weapon as soon as practical.

   a.  The immediate supervisor of any officer issued a replacement firearm will be responsible for scheduling the officer to qualify with the replacement firearm:

      1)  as soon as practical, and

      2)  prior to the officer's return to duty.

   b. Weapons will only be handled or manipulated by the investigating agency or the Professional Standards Unit personnel.

*1.3.8*

6.  Pending conclusion of use of force investigation(s), any employee whose actions or use of force resulted in death or serious physical injury will be relieved from the line of duty through either:

   a.  modified duty, or

   b.  administrative leave with pay.

N.  <u>MANDATORY COUNSELING</u>

1.  An employee who is directly involved in a Use of Force incident resulting in death or serious physical injury to a person will report for counseling to a mental health professional selected by the department.

   a.  Such counseling is intended to assist in the prevention of any adverse emotional effect resulting from the officer's experience.

   b.  Such counseling is made *mandatory* to ensure that the officer receives some form of timely assistance.

2.  The number of mandatory sessions attended by an officer will be decided by the Chief of Police, in conjunction with the recommendation of the assigned mental health professional.

    a.   Mandatory session(s) will be scheduled during the officer's duty time, if practical; otherwise the department will pay overtime or grant compensatory leave earned.

    b.   Payment for all mandatory sessions will be made by the department.

3.   The affected officer's Deputy Chief will be responsible for:

    a.   selecting a mental health professional qualified to meet the perceived need and recommending him to the Chief of Police for approval; and

    b.   scheduling a timely appointment with the approved mental health professional; and

    c.   notifying the officer in writing of the scheduled appointment and the mental health professional selected.

4.   Any non-mandatory sessions arranged by an officer will be the financial responsibility of that officer.

*1.3.13 / 1.3.11*

O.  <u>ANALYSIS AND TRAINING</u>

1.   At least annually, all officers will receive department-approved training on use of force.

    a.   Training may include practical exams, proficiency exercises, or tests covering the training material that officers must pass.

    b.   Information related to exams, exercises, and tests will be maintained by the Personnel & Recruiting Unit.

2.   The Field Operations Bureau Captains will be responsible for conducting an annual analysis of Use of Force incidents occurring within each calendar year.

    a.   This analysis will:

       1)   examine use of force incidents, policies and practices; and

       2)   be limited to use of force incidents documented by means of Blue Team and IBR reports documenting the discharging of firearms for the purpose of killing wild or domesticated animals; and

       3)   serve as a means of identifying needs for supplementary training, equipment, or procedural changes.

    b.   This analysis should identify:

1) dates and times of incidents

2) types of encounters resulting in force

3) trends or patterns related to race, age, and gender of subjects involved

4) trends or patterns resulting in injury to any person including employees

5) the impact of the findings on policies, practices, and training

c.   The Chief of Police will be notified of the annual analysis findings.

*Original Signed*

_____
Ryan M. Zuidema
Chief of Police

January 13, 2021

_____
Date

CITY 000590





| | WRITTEN DIRECTIVE | No.<br>PD16-0706 | Page:<br>1 of 9 |
|---|---|---|---|
| Subject:<br><br>USE OF CANINE TEAMS | | Effective<br>Date: | 12-5-16 |
| | | Supersedes/<br>Amends: | PD14-0706 |
| | | Reference: | ADDENDUM<br>41.1.4, |

## I. Purpose

The purpose of this directive is to establish guidelines for use of departmental and non-departmental canine teams by officers of the Lynchburg Police Department.

## II. Policy

It shall be the policy of the Lynchburg Police Department to utilize trained police canines in a variety of law enforcement roles.

## III. Procedure

  A. <u>GENERAL</u>

    1. For the purpose of this directive, the following definitions will apply:

      a. *Canine or K-9* – trained police dog.

      b. *Handler* – officer trained to maintain control of a trained police dog.

      c. *Canine/K-9 Team*– handler and trained police dog.

      d. *Patrol Canine* – trained police dog capable of apprehensions, area searches, handler protection, article searches, building searches and tracking.

      e. *Narcotic Detection Canine* – trained police dog capable of detecting and locating certain illegal drugs.

      f. *Ordnance/Explosive Detection Canine* – trained police dog capable of detecting a variety of explosive and highly combustible materials.

*41.1.4 A*

    2. The decision to notify an off-duty K-9 Team to respond to an incident scene will be at the discretion of a supervisor, and based upon the:

      a. nature and seriousness of the incident

      b. probable effectiveness of a canine in resolving the incident.

    3. The Chief of Police, or his designee, will make all decisions regarding the removal of a police canine from service, as well as the final disposition of the police canine.

CITY 000591

4.  Canines are owned by the Lynchburg Police Department and will not be considered personal property of the handler: department canines will not be involved in any activities that are not job-related unless previously approved by the Chief of Police.

5.  Canines will be maintained under the direct supervision of the handler.

    a.  Lynchburg Police Department employees will not directly interact with police canines unless instructed to do so by the handler.

    b.  Civilians will not be allowed to directly interact with police canines unless instructed to do so by the handler.

6.  Use of police canines for any of the following purposes will be in accordance with guidelines set forth in directive PD-0602 (*Use of Force*):

    a.  physical restraint and control

    b.  apprehending or subduing a person resisting arrest

    c.  defense of any person

7.  All handlers will conduct themselves in a professional manner in any activity involving the handling or control of their canines.

*41.1.4 C*

B.  RESPONSIBILITIES

1.  It shall be the responsibility of the handler to care for, maintain and control his assigned canine: at no time will the canine be permitted to run loose without direct supervision of the handler.

2.  Police canines will be kenneled at the handler's residence and shall be groomed, fed, watered and cared for daily.

    a.  Each canine handler will be responsible for cleaning and maintaining his assigned vehicle and his assigned canine's kennel.

    b.  In situations where the handler will be away from an assigned canine for an extended period of time, the canine will be boarded in a department-approved veterinarian's office, or cared for by another department-trained police canine handler.

3.  Handlers will ensure that their canines are examined by a department-approved veterinarian at least once a year.

    a.  All appropriate and required shots will be kept up to date.

    b.  A copy of the shot records will be maintained on file at the Lynchburg Police Department.

   4.  Should a canine handler be injured or incapacitated, other officers will take whatever action is required in order to render the handler assistance.

*41.1.4 B*

C.  <u>TRAINING</u>

   1.  No department-owned canine will be approved for service unless both the canine and handler have successfully completed a course of instruction approved by the Chief of Police.

   2.  K-9 Team certification and re-certification will occur in accordance with standards promulgated by the Virginia Police Work Dog Association or the North American Police Work Dog Association.

   3.  Formal training sessions for canine teams will be conducted on an as-needed basis.  Handlers will participate in periodic informal training, contingent on the need to assist with calls for service.

   4.  All canine training sessions will be conducted in such a manner as to ensure the safety of all involved.

     a.  The handler will be responsible for maintaining an up-to-date training/usage log on his canine.

     b.  The handler's supervisor will be responsible for:

       1.  reviewing handler training logs on as monthly basis

       2.  ensuring that training logs are accurately and completely maintained.

   5.  Narcotics used for canine training will be obtained, stored and used in accordance with guidelines established by the Lynchburg Police Department, the Drug Enforcement Administration and the Commonwealth of Virginia Board of Pharmacology.

     a.  All drugs used for canine training will be maintained by the Property & Evidence Unit and will only include items designated for destruction.

     b.  The amount of drugs allowed to be released for training is governed by court order and specified weights will be adhered to.

     c.  Unless authorized by the Property & Evidence supervisor, original drug packaging and amounts signed out for training will not be altered or separated.

1) If the drug is contained within secure packaging as when it was first seized, then the evidence bag may be opened to allow more of the drug's odor to disseminate. The evidence bag must be resealed and initialed after training is complete.

   d. Drugs signed out for canine training will be returned to Property and Evidence by the end of the training day.

D. <u>USE OF NARCOTICS DETECTOR CANINES</u>

1. Narcotics detector canines are generally certified to detect the following controlled substances, and related derivatives and paraphernalia:

   a. cocaine

   b. hashish

   c. heroin

   d. marijuana

   e. methamphetamine.

2. Narcotics detector canines are trained to detect the odors of certain controlled substances emitting from the interior or along the exterior of a motor vehicle.

3. Motor vehicle engines should be turned off in areas where canines are being used.

E. <u>USE OF CANINES FOR BUILDING OR AREA SEARCHES</u>

1. Area search canines can be used to locate hidden suspects who are believed to be contained within an area:

   a. of limited size, and

   b. otherwise deserted, or from which all other persons can be removed by officers.

2. *Tracking canines* are better suited to selectively follow a particular scent trail over distance or in the presence of other, non-involved persons.

3. Motor vehicle engines should be turned off when canines are nearby.

F.   <u>USE OF TRACKING CANINES</u>

1.   Tracking canines are generally able to detect, discriminate among and follow a wide variety of human scents to locate:

a.   suspects who have fled a crime scene

b.   human remains

c.   hidden evidence or missing property

d.   missing persons.

2.   Other persons should be kept away from the search area.

3.   Motor vehicle engines should be turned off near the search area.

G.   <u>USE OF ORDNANCE/EXPLOSIVE DETECTOR CANINES</u>

1.   Ordnance/explosive canine assistance will be requested by contacting the appropriate agency listed in the *PD-0706* addendum, *Canine Contact Information*.

2.   Ordnance/explosive detector canines are able to detect a variety of explosive and highly combustible materials within most settings, generally using some form of passive "alert" behavior to signal detection of such substances.

3.   Officers will take initial steps to secure scenes involving the presence or threat of explosives as set forth in written directive *PD-0701* (*Bomb Threats/Bombing Incidents)*.

4.   On arrival, the canine handler will be briefed by the on-scene supervisor: the canine handler will then specify what assistance is needed to facilitate a successful search.

H.   <u>DOCUMENTATION</u>

1.   Any bite case involving department-owned canines will be documented as a *Use of Force* incident except in the conduct of normal aggression training.

2.   The canine handler will document any incidental damage to personal property caused by a canine search or during canine use by means of an IBR *Incident Report*.

4.   The incident supervisor will document any property damage that occurs during a canine search in which no evidence is discovered.

CITY 000595

a.  Such documentation will be in memorandum format, and will be submitted prior to the end of the supervisor's shift.

b.  The Memorandum and any attachments will be forwarded through the chain of command to the Chief of Police.

c.  The incident supervisor will forward a copy of the *Memorandum* to the City Risk Management Office within 24 hours of the incident.

4.  Canine handlers are responsible for maintaining up-to-date training and activity records for each canine.  These records will be filed at the Lynchburg Police Department.

*41.1.4 D*

I.  EQUIPMENT

1.  Department handlers will have the following items accessible at all times when working with their canines:

a.  uniform to fit specific job function

b.  12 inch general use leather leash

c.  6 foot general use leather leash

d.  15 foot nylon tracking leash

e.  3 foot traffic lead

f.  chain choker collar

g.  muzzle

h.  exterior bite sleeve.

2.  Handlers will be responsible for having necessary and appropriate equipment readily available for response to any incident within the scope of their canine's ability to handle.

*41.1.4 D*

J.  VEHICLES

1.  Officers assigned as K-9 handlers will:

*41.1.3 A-C*

a   be responsible for the maintenance of the vehicles assigned to them.

b   be authorized to operate K-9 vehicles for the purpose of carrying out assigned duties and for maintaining and transporting department K-9's.

c.  complete training regarding special functions related to the vehicle.

CITY 000596

    1)  Training on the operation of a police K-9 vehicle may occur during an officer's initial K-9 certification training or through an informal training session with another department K-9 officer.

2. All department vehicles regularly used for canine transport will be equipped with department-approved transport cages or containers.

3. Department vehicles routinely used to transport a canine will be adequately marked to inform persons approaching the vehicle that it contains a police canine.

5. Except in extenuating circumstances, only trained canine handlers will be authorized to operate a vehicle containing a police canine without prior supervisory authorization.

6. Absent extenuating circumstances, police canines will only be transported in a police vehicle equipped with a kennel.

    a)  Under extenuating circumstances, supervisors may authorize canines to be transported in alternate vehicles.

K. <u>USE OF NON-DEPARTMENTAL CANINE TEAMS</u>

1. A listing of canine teams currently available from other agencies for use by the Lynchburg Police Department will be maintained in an *Addendum* to this directive.

2. The decision whether or not to request the assistance of a non-departmental canine team will rest with the incident supervisor, based upon assessment of:

    a.  the nature and seriousness of the incident

    b.  conditions at the scene related to canine effectiveness

    c.  situational canine limitations as set forth in this directive

    d.  canine team availability and response time.

3. In any situation where it becomes apparent to an incident supervisor that a non-departmental canine or handler is not properly trained, the supervisor will:

    a.  terminate use of that canine team

    b.  complete a *Memorandum* documenting the circumstances leading up to his action

    c.   forward the *Memorandum* through the chain of command to the Chief of Police.

4.   Officers will document assistance rendered by canine teams from other agencies by means of an IBR *Incident Report*, to include the following information:

    a.   events leading up to the request for the canine team's assistance

    b.   all steps taken to secure the search area, both prior to the canine team's arrival and during the course of the search

    c.   agency to which the responding canine team belongs

    d.   canine handler's name and the canine's name

    e.   times of the original incident, area containment, request for a canine team's assistance, canine team arrival and search duration

    f.   search results

    g.   in cases where the handler indicates that the canine cannot be deployed, the reasons given

    h.   any personal injury or property damage resulting from deployment of the canine team

    i.   any other pertinent information.

L.   <u>CANINE RETIREMENT</u>

1.   Police canines shall be retired at a time when it has been determined that they are no longer able to effectively perform their assigned tasks.

    a.   This shall be regardless of the age of the police canine or his years of service.

    b.   A master trainer, certified through either the Virginia Police Work Dog Association or the North American Police Work Dog Association may be conferred with to evaluate the police canine and make a recommendation on the police canine's effectiveness and usefulness for police-related tasks.

    c.   A department-approved veterinarian may also be conferred with to evaluate the police canine's physical health as it relates to performing police-related tasks.

CITY 000598

M.   DISPOSITION OF POLICE CANINE

1.   If the current handler of the police canine requests to keep the canine after the canine's retirement, the handler shall be granted first opportunity to obtain the retired canine.

2.   If the current handler of the police canine to be retired is not interested in keeping the canine, the canine shall be offered (in the following order) to:

a.   other current or previous police canine handlers of the Lynchburg Police Department

b.   other sworn Lynchburg Police Department employees

c.   anyone else that the Chief of Police deems as capable of accepting a police canine.

3.   When it is determined who will receive the retired police canine, that person will pay the Lynchburg Police Department the amount of one dollar.

4.   The person receiving the retired police canine shall sign a Retired Police Canine: Liability Waiver, thus releasing the Lynchburg Police Department of any responsibilities involving the retired police canine.

a.   The original signed waiver will be filed at the Lynchburg Police Department.

b.   A copy of the waiver will be forwarded to the City Attorney.

*Original Signed*
_____
Raul M. Diaz
Chief of Police

December 5, 2016
_____
Date





| WRITTEN DIRECTIVE | No. PD21-0706 | Page: 1 of 9 |
|---|---|---|
| Subject: USE OF CANINE TEAMS | Effective Date: | 05-20-21 |
| | Supersedes/ Amends: | PD16-0706 |
| | Reference: | ADDENDUM 41.1.4, |

### I. Purpose

The purpose of this directive is to establish guidelines for use of departmental and non-departmental canine teams by officers of the Lynchburg Police Department.

### II. Policy

It shall be the policy of the Lynchburg Police Department to utilize trained police canines in a variety of law enforcement roles.

### III. Procedure

A. GENERAL

1. For the purpose of this directive, the following definitions will apply:

   a. *Canine or K-9* – trained police dog.

   b. *Handler* – officer trained to maintain control of a trained police dog.

   c. *Canine/K-9 Team*– handler and trained police dog.

   d. *Patrol Canine* – trained police dog capable of apprehensions, area searches, handler protection, article searches, building searches and tracking.

   e. *Narcotic Detection Canine* – trained police dog capable of detecting and locating certain illegal drugs.

   f. *Ordnance/Explosive Detection Canine* – trained police dog capable of detecting a variety of explosive and highly combustible materials.

**41.1.4 A**

2. The decision to notify an off-duty K-9 Team to respond to an incident scene will be at the discretion of a supervisor, and based upon the:

   a. nature and seriousness of the incident

   b. probable effectiveness of a canine in resolving the incident.

3. The Chief of Police, or his designee, will make all decisions regarding the removal of a police canine from service, as well as the final disposition of the police canine.

4.  Canines are owned by the Lynchburg Police Department and will not be considered personal property of the handler: department canines will not be involved in any activities that are not job-related unless previously approved by the Chief of Police.

5.  Canines will be maintained under the direct supervision of the handler.

    a.  Lynchburg Police Department employees will not directly interact with police canines unless instructed to do so by the handler.

    b.  Civilians will not be allowed to directly interact with police canines unless instructed to do so by the handler.

6.  Use of police canines for any of the following purposes will be in accordance with guidelines set forth in directive PD-0602 (*Use of Force)*:

    a.  physical restraint and control

    b.  apprehending or subduing a person resisting arrest

    c.  defense of any person

7.  All handlers will conduct themselves in a professional manner in any activity involving the handling or control of their canines.

*41.1.4 C*

B.  RESPONSIBILITIES

1.  It shall be the responsibility of the handler to care for, maintain and control his assigned canine: at no time will the canine be permitted to run loose without direct supervision of the handler.

2.  Police canines will be kenneled at the handler's residence and shall be groomed, fed, watered and cared for daily.

    a.  Each canine handler will be responsible for cleaning and maintaining his assigned vehicle and his assigned canine's kennel.

    b.  In situations where the handler will be away from an assigned canine for an extended period of time, the canine will be boarded in a department-approved veterinarian's office, or cared for by another department-trained police canine handler.

3.  Handlers will ensure that their canines are examined by a department-approved veterinarian at least once a year.

    a.  All appropriate and required shots will be kept up to date.

b.  A copy of the shot records will be maintained on file at the Lynchburg Police Department.

4.  Should a canine handler be injured or incapacitated, other officers will take whatever action is required in order to render the handler assistance.

**41.1.4 B**

C.  <u>TRAINING</u>

1.  No department-owned canine will be approved for service unless both the canine and handler have successfully completed a course of instruction approved by the Chief of Police.

2.  K-9 Team certification and re-certification will occur in accordance with standards promulgated by the Virginia Police Work Dog Association or the North American Police Work Dog Association.

3.  Formal training sessions for canine teams will be conducted on a monthly basis.  Handlers will participate in periodic informal training, contingent on the need to assist with calls for service.

4.  All canine training sessions will be conducted in such a manner as to ensure the safety of all involved.

a.  The handler will be responsible for maintaining an up-to-date training/usage log on his canine.

b.  The handler's supervisor will be responsible for:

1.  reviewing handler training logs on as monthly basis

2.  ensuring that training logs are accurately and completely maintained.

5.  Narcotics used for canine training will be obtained, stored and used in accordance with guidelines established by the Lynchburg Police Department, the Drug Enforcement Administration and the Commonwealth of Virginia Board of Pharmacology.

a.  All drugs used for canine training will be maintained by the Property & Evidence Unit and will only include items designated for destruction.

b.  The amount of drugs allowed to be released for training is governed by court order and specified weights will be adhered to.

c.  Unless authorized by the Property & Evidence supervisor, original drug packaging and amounts signed out for training will not be altered or separated.

   1)   If the drug is contained within secure packaging as when it was first seized, then the evidence bag may be opened to allow more of the drug's odor to disseminate. The evidence bag must be resealed and initialed after training is complete.

  d.   Drugs signed out for canine training will be returned to Property and Evidence by the end of the training day.

D.   <u>USE OF NARCOTICS DETECTOR CANINES</u>

   1.   Narcotics detector canines are generally certified to detect the following controlled substances, and related derivatives and paraphernalia:

     a.   cocaine

     b.   hashish

     c.   heroin

     d.   marijuana

     e.   methamphetamine.

   2.   Narcotics detector canines are trained to detect the odors of certain controlled substances emitting from the interior or along the exterior of a motor vehicle.

   3.   Motor vehicle engines should be turned off in areas where canines are being used.

E.   <u>USE OF CANINES FOR BUILDING OR AREA SEARCHES</u>

   1.   Area search canines can be used to locate hidden suspects who are believed to be contained within an area:

     a.   of limited size, and

     b.   otherwise deserted, or from which all other persons can be removed by officers.

   2.   *Tracking canines* are better suited to selectively follow a particular scent trail over distance or in the presence of other, non-involved persons.

   3.   Motor vehicle engines should be turned off when canines are nearby.

F.  <u>USE OF TRACKING CANINES</u>

    1.  Tracking canines are generally able to detect, discriminate among and follow a wide variety of human scents to locate:

        a.  suspects who have fled a crime scene

        b.  human remains

        c.  hidden evidence or missing property

        d.  missing persons.

    2.  Other persons should be kept away from the search area.

    3.  Motor vehicle engines should be turned off near the search area.

G.  <u>USE OF ORDNANCE/EXPLOSIVE DETECTOR CANINES</u>

    1.  Ordnance/explosive canine assistance will be requested by contacting the appropriate agency listed in the *PD-0706* addendum, *Canine Contact Information.*

    2.  Ordnance/explosive detector canines are able to detect a variety of explosive and highly combustible materials within most settings, generally using some form of passive "alert" behavior to signal detection of such substances.

    3.  Officers will take initial steps to secure scenes involving the presence or threat of explosives as set forth in written directive *PD-0701* (*Bomb Threats/Bombing Incidents).*

    4.  On arrival, the canine handler will be briefed by the on-scene supervisor: the canine handler will then specify what assistance is needed to facilitate a successful search.

H.  <u>DOCUMENTATION</u>

    1.  Any bite case involving department-owned canines will be documented as a *Use of Force* incident except in the conduct of normal aggression training.

    2.  The canine handler will document any incidental damage to personal property caused by a canine search or during canine use by means of an IBR *Incident Report.*

    4.  The incident supervisor will document any property damage that occurs during a canine search in which no evidence is discovered.

      a.   Such documentation will be in memorandum format, and will be submitted prior to the end of the supervisor's shift.

      b.   The Memorandum and any attachments will be forwarded through the chain of command to the Chief of Police.

      c.   The incident supervisor will forward a copy of the *Memorandum* to the City Risk Management Office within 24 hours of the incident.

4.   Canine handlers are responsible for maintaining up-to-date training and activity records for each canine.  These records will be filed at the Lynchburg Police Department.

*41.1.4 D*

I.   <u>EQUIPMENT</u>

1.   Department handlers will have the following items accessible at all times when working with their canines:

      a.   uniform to fit specific job function

      b.   12 inch general use leather leash

      c.   6 foot general use leather leash

      d.   15 foot nylon tracking leash

      e.   3 foot traffic lead

      f.   chain choker collar

      g.   muzzle

      h.   exterior bite sleeve.

2.   Handlers will be responsible for having necessary and appropriate equipment readily available for response to any incident within the scope of their canine's ability to handle.

*41.1.4 D*

J.   <u>VEHICLES</u>

1.   Officers assigned as K-9 handlers will:

*41.1.3 A-C*      a   be responsible for the maintenance of the vehicles assigned to them.

      b   be authorized to operate K-9 vehicles for the purpose of carrying out assigned duties and for maintaining and transporting department K-9's.

      c.   complete training regarding special functions related to the vehicle.

1) Training on the operation of a police K-9 vehicle may occur during an officer's initial K-9 certification training or through an informal training session with another department K-9 officer.

2. All department vehicles regularly used for canine transport will be equipped with department-approved transport cages or containers.

3. Department vehicles routinely used to transport a canine will be adequately marked to inform persons approaching the vehicle that it contains a police canine.

5. Except in extenuating circumstances, only trained canine handlers will be authorized to operate a vehicle containing a police canine without prior supervisory authorization.

6. Absent extenuating circumstances, police canines will only be transported in a police vehicle equipped with a kennel.

   a) Under extenuating circumstances, supervisors may authorize canines to be transported in alternate vehicles.

K.  <u>USE OF NON-DEPARTMENTAL CANINE TEAMS</u>

1. A listing of canine teams currently available from other agencies for use by the Lynchburg Police Department will be maintained in an *Addendum* to this directive.

2. The decision whether or not to request the assistance of a non-departmental canine team will rest with the incident supervisor, based upon assessment of:

   a.  the nature and seriousness of the incident

   b.  conditions at the scene related to canine effectiveness

   c.  situational canine limitations as set forth in this directive

   d.  canine team availability and response time.

3. In any situation where it becomes apparent to an incident supervisor that a non-departmental canine or handler is not properly trained, the supervisor will:

   a.  terminate use of that canine team

   b.  complete a *Memorandum* documenting the circumstances leading up to his action

    c.   forward the *Memorandum* through the chain of command to the Chief of Police.

4. Officers will document assistance rendered by canine teams from other agencies by means of an IBR *Incident Report*, to include the following information:

    a.   events leading up to the request for the canine team's assistance

    b.   all steps taken to secure the search area, both prior to the canine team's arrival and during the course of the search

    c.   agency to which the responding canine team belongs

    d.   canine handler's name and the canine's name

    e.   times of the original incident, area containment, request for a canine team's assistance, canine team arrival and search duration

    f.   search results

    g.   in cases where the handler indicates that the canine cannot be deployed, the reasons given

    h.   any personal injury or property damage resulting from deployment of the canine team

    i.   any other pertinent information.

L. <u>CANINE RETIREMENT</u>

1. Police canines shall be retired at a time when it has been determined that they are no longer able to effectively perform their assigned tasks.

    a.   This shall be regardless of the age of the police canine or his years of service.

    b.   A master trainer, certified through either the Virginia Police Work Dog Association or the North American Police Work Dog Association may be conferred with to evaluate the police canine and make a recommendation on the police canine's effectiveness and usefulness for police-related tasks.

    c.   A department-approved veterinarian may also be conferred with to evaluate the police canine's physical health as it relates to performing police-related tasks.

M. DISPOSITION OF POLICE CANINE

   1. If the current handler of the police canine requests to keep the canine after the canine's retirement, the handler shall be granted first opportunity to obtain the retired canine.

   2. If the current handler of the police canine to be retired is not interested in keeping the canine, the canine shall be offered (in the following order) to:

     a. other current or previous police canine handlers of the Lynchburg Police Department

     b. other sworn Lynchburg Police Department employees

     c. anyone else that the Chief of Police deems as capable of accepting a police canine.

   3. When it is determined who will receive the retired police canine, that person will pay the Lynchburg Police Department the amount of one dollar.

   4. The person receiving the retired police canine shall sign a Retired Police Canine: Liability Waiver, thus releasing the Lynchburg Police Department of any responsibilities involving the retired police canine.

     a. The original signed waiver will be filed at the Lynchburg Police Department.

     b. A copy of the waiver will be forwarded to the City Attorney.


*Original Signed*
_____
Ryan M. Zuidema
Chief of Police

May 20, 2021
_____
Date




| WRITTEN DIRECTIVE | No. PD19-1601 | Page: 1 of 18 |
|---|---|---|
| Subject:<br><br>**INTERNAL INVESTIGATIONS** | Effective Date: | 03-14-19 |
| | Supersedes/ Amends: | PD18-1601 |
| | Reference: | 1.3.13, 1.3.7, 52.1.1, 52.2.2, 52.2.5, 52.2.6, 52.2.7, 35.1.9 |

## I. Purpose

The purpose of this directive is to establish guidelines for conducting Lynchburg Police Department internal investigations.

*52.1.1*

## II. Policy

It shall be the policy of the Lynchburg Police Department to conduct internal investigations in an impartial and objective manner as well as maintain security of related administrative files.

## III. Procedure

A. GENERAL

1. For the purposes of this directive, *internal investigations* will be defined as investigations related to the activities of department employees and conducted by department supervisory staff;

2. Internal investigations will include the following types of investigations:

   a. *administrative investigations* -- conducted for LPD administrative and personnel management purposes to include the following:

      1) determination of fact in cases where department employees are alleged to have:

         a) improperly performed their duties, or

         b) displayed unprofessional or inappropriate demeanor in performing their duties, or

         c) engaged in some form of misconduct.

*1.3.7*

      2) review of employee actions and related circumstances associated with:

         a) use of force incidents documented by means of BlueTeam [see directive PD-0602 (*Use of Force*)

            i. Incidents involving the euthanizing of a seriously injured animal will be reviewed by the involved officer's immediate supervisor when such incidents occur and when the related IBR is filed.

        b)   vehicle pursuit incidents [see directive PD-0702 (*Vehicle Pursuit*)]

        c)   employee motor vehicle accidents [see directive PD-0207 (*Employee Motor Vehicle Accidents*)]

        d)   high-profile incidents (see directive PD-0402 *Significant Incident Management*)

      3)   evaluation of employee fitness for duty

      4)   other departmental fact-finding purposes, as directed by the Chief of Police.

    b.   *criminal investigations* – conducted for law enforcement purposes to include determining whether any crime has been committed, gathering necessary evidence, and preparing cases for prosecution review.

B.   <u>BASIC INTERNAL INVESTIGATION GUIDELINES</u>

    1.   Every effort will be made to ensure that internal investigations are conducted with confidentiality and in a thorough, timely fashion.

      a.   Internal investigations will be conducted by supervisory staff.

      b.   Internal investigations should be completed within the timeframe allocated to each type of investigation: additional time to complete an investigation may be approved, as necessary, by a supervisory level designated to oversee that particular type of investigation.

    2.   An employee, whether the subject of or a witness in an administrative internal investigation, shall be subject to disciplinary action, including discharge, for failure to:

      a.   promptly and fully cooperate with internal administrative investigation procedures

      b.   truthfully and completely discuss matters and incidents related to an internal investigation

      c.   comply with required examinations, procedures, and disclosures.

    3.   Employee interviews related to an internal administrative investigation will be conducted as follows:

      a.   Whenever possible, employee interviews will be scheduled at a reasonable time and place – preferably during the employee's regular working hours.

        1)   The needs of the investigation may dictate that interviews be scheduled outside these parameters.

        2)   Interview scheduling will be the responsibility of the investigating supervisor.

3)   Interviews will be conducted so as to maintain the confidentiality of the investigation and the employee interviewed.

b.   Whenever circumstances permit, the investigating supervisor will notify an employee's unit or division commander prior to interviewing the employee.

c.   Prior to being questioned as part of an internal investigation, an employee will be informed of:

1)   the name and rank of the investigating officer and of any person to be present during the questioning

2)   the nature of the investigation being conducted.

d.   A *Statement for Administrative Purposes* form will be reviewed and completed by the investigating supervisor and the employee interviewed (as either the subject of the investigation or as a witness) prior to initiation of any administrative investigation interview.

1)   The *Statement for Administrative Purposes* form will clearly indicate that the statement given:

a)   is an ordered employee statement for Lynchburg Police Department internal investigative purposes

b)   is protected from use for any other purpose under the *Garrity v. New Jersey* and *Gardner v. Broderick* Supreme Court decisions.

2)   The investigating supervisor will provide the interviewed employee with a copy of the signed *Statement for Administrative Purposes* form on request.

3)   The original, signed *Statement for Administrative Purposes* form will be scanned and attached to the investigation in IAPro.

*52.2.7*

4.   An employee may be relieved from their regular duty assignment pending disposition of an internal investigation when their continued presence on the job is deemed not to be in the best interest of the department or the employee.

a.   In the case of Captain rank or lower, it will be at the discretion of a Deputy Chief to accomplish removal from regular duty by means of administrative leave or special duty assignment.

b.   In the case of rank of Deputy Chief, it will be at the discretion of the Chief of Police to accomplish removal from regular duty by means of administrative leave or special duty assignment.

c.   Such removal from regular duty will not be considered as a disciplinary action.

*52.2.6*

5. The Chief of Police or a Deputy Chief may require a department employee to submit to certain examinations, procedures, and/or disclosures as listed below when those examinations, procedures or disclosures are specifically directed and narrowly related to a particular internal investigation being conducted.  Such examinations (to include, but not be limited to, those listed below) will be at departmental expense:

*52.2.6  A & E*

a. medical, laboratory, psychological or polygraph examinations (the Chief of Police has sole authority to direct use of a polygraph examination)

b. alcohol/drug screening tests (Code of Virginia, Section 9.1-501)

*52.2.6 B*

c. the taking and display of employee photographs

d. audio/video recordings

*52.2.6 C*

e. participation in a line-up

*52.2.6 D*

f. disclosure of financial information (Code of Virginia, Section 9.1-503).

6. Procedures for employee drug/alcohol screen testing:

a. Any supervisor considering the use of such testing must obtain prior approval from either the Chief or a Deputy Chief.

b. HealthWorks will be available to perform drug/alcohol screen testing for the department during business hours.

   1) Such testing will be conducted according to the City of Lynchburg *Drug-Free Workplace Policy*.

   2) HealthWorks or the Lynchburg General Hospital (LGH) Laboratory will be responsible for the proper collection, labeling, chain of custody, testing, and dissemination of results of all specimens collected by HealthWorks

c. After normal business hours, employees of the Lynchburg General Hospital laboratory will be available to perform drug/alcohol screen testing for the department.

   1) Such testing will be conducted according to the City of Lynchburg *Drug-Free Workplace Policy*.

   2) The LGH Laboratory staff will be responsible for the proper collection, labeling, chain of custody, testing, and dissemination of results of all specimens collected within that facility.

      a) Employees should go directly to the LGH Laboratory, not to the Emergency Department, to have drug/alcohol screen testing performed.

      b) Results of testing conducted at the LGH Laboratory will be forwarded to the City Occupational Health Nurse.

7.   Information obtained in the course of an administrative internal investigation will not be used by this department for any purpose other than the completion of that investigation and the determination of appropriate departmental action, if any, to be taken.

8.   The supervisor completing an internal investigation will document his investigative findings – to include a summary report and a conclusion of fact -- within a report that will be reviewed by the involved employee's chain of command.

C.   ALLEGATION OF MISCONDUCT INVESTIGATION

1.   For the purposes of this directive, an *Allegation of Misconduct* will be defined as an allegation made by any person indicating that an LPD employee's action, or failure to act, has constituted:

   a.   any form of corruption

   b.   a violation of any person's civil rights

   c.   a violation of criminal law

   d.   a serious breach of departmental or City policy, procedure, or employee rules of conduct.

   e.   Use of force incidents will be investigated by a supervisor through Blue Team to determine if an officers' actions were justified per *PD0602 Use of Force*.  In the event that a complaint is received of an excessive use of force and if there are extenuating circumstances, the Professional Standards Unit may be asked to review the original use of force investigation to determine if further investigation is required.

*52.1.1*

2.   All allegations of employee misconduct – including anonymous allegations --communicated to the Lynchburg Police Department in any fashion will be documented and investigated according to procedures set forth within this directive.

3.   Employee receipt and forwarding of misconduct allegations:

   a.   An employee receiving a citizen's allegation of misconduct in person or by telephone will refer the complainant to:

      1)   the involved employee's immediate supervisor, or (if unavailable)

      2)   the highest ranking supervisory officer available within a reasonable period of time, or (if unavailable)

      3)   the involved employee's Deputy Chief

   b.   An employee receiving a citizen's allegation of misconduct by mail or facsimile will forward the allegation directly to the involved employee's Deputy Chief.

   c.   Employees receiving a citizen's allegation of misconduct will not discuss it with persons other than:

      1)   the supervisor to whom they report the allegation

2) the supervisor subsequently designated to investigate the allegation

3) the involved employee's Deputy Chief

*26.1.3*

d. Any employee wishing to make an allegation of misconduct against another employee will do so either

1) to that employee's immediate supervisor, or

2) to the involved employee's Deputy Chief, or

3) to the Professional Standards Division, or

4) to the City of Lynchburg Human Resources office.

4. Supervisory receipt and forwarding of misconduct allegations:

a. The supervisor receiving an allegation of misconduct will:

1) complete, prior to the end of that duty tour, document the allegation in Blue Team

2) forward the *Allegation of Misconduct* and all linked attachments to the involved employee's Deputy Chief.

3) Upon receiving and documenting a complaint, the supervisor will notify the involved employee's bureau Captain:

    a) immediately -- in the case of a serious allegation, or at any time when delay would negatively impact the conducting of a fair, complete and objective investigation

    b) the next business day --in cases where the delay would not negatively impact the conducting of a fair, complete and objective investigation.

4) The Bureau Captain will notify the involved employee's Deputy Chief.

b. The supervisor receiving an allegation of misconduct will request that the complainant(s) complete and sign an *Allegation of Misconduct Statement* form.

1) Completion of this form is not mandatory prior to the initiation of an investigation.

2) On request, the complainant may be given a copy of the completed *Statement* form *only* if the complainant has signed the form.

3) The original *Allegation of Misconduct Statement* form will be linked as an attachment in Blue Team

5. The *Allegation of Misconduct* complaint, the *Allegation of Misconduct Statement* form, and any attachment will be considered attorney work

products -- no copy in addition to those specified by directive will be made without prior authorization from the Chief of Police.

*52.2.1 B*

6.   The Administration Bureau Captain will be responsible for:

a.   Coordinating the allegation of misconduct investigation process, to include:

1)   assigning a unique number to each allegation of misconduct received

2)   conferring with the involved employees Deputy Chief, the Chief of Police and other supervisory staff as necessary to confirm what type of investigative action is required

3)   assigning allegation of misconduct investigative responsibility to a supervisory staff member

4)   providing the complainant with:

a)   verification that the allegation of misconduct complaint has been received

b)   periodic reports, as necessary, on the progress of the related internal investigation

c)   notice on conclusion of the related internal investigation.

*52.2.5*

5)   providing the accused employee with the following investigation-related information (unless providing such information is deemed likely to jeopardize any investigation):

a)   notice (in letter form) that an allegation of misconduct has been made

b)   information on the specific nature of the misconduct alleged

c)   information on the employee's rights and responsibilities pertaining to the related internal investigation

d)   the name of the supervisor conducting the investigation

e)   periodic reports, as necessary, on the progress of the related internal investigation

f)   notice (in letter form) on conclusion of the related internal investigation, and on the investigating supervisor's conclusion of fact.

6)   generally monitoring and assisting with ongoing internal investigations

7)   conferring with the Chief of Police and other authorities as necessary to appropriately direct the course of the investigation.

7.   The supervisor(s) assigned to investigate an allegation of employee misconduct will be responsible for:

a.   complying with the general internal investigation guidelines set forth in section III, B of this directive

b.   ensuring that the investigation conducted:

1)   is both adequate and appropriate to the nature and gravity of the complaint received

2)   is narrowly focused on the specific misconduct alleged

3)   is completed in a timely manner

a)   Investigating supervisors will make every effort to complete allegation of misconduct investigations within 90 calendar days.

b)   As necessary, the investigating supervisor may request the Administration Bureau Captain to grant additional time for completion of an ongoing investigation.

c.   informing the Deputy Chief of the Administration Bureau of any significant investigative developments as soon as possible after these developments become known

*52.2.2, 52.2.8*

d.   including within the allegation of misconduct investigation report one of the following conclusions of fact for each identified allegation of misconduct:

1)   **Sustained** - there is sufficient evidence to prove the allegation.

2)   **Non Sustained** - there is insufficient evidence to either prove or disprove the allegation.

3)   **Exonerated** - the alleged incident occurred, but the involved employee's action was lawful and proper.

4)   **Unfounded** - the allegation is false or not factual.

5)   **Policy Review**- the allegation is true, however the employee's practices were consistent with departmental policy: as result, the policy should be reviewed to ensure that operational practices remain consistent with the department's philosophy.

6)   **Complaint Withdrawn** – the person who made the allegation of misconduct withdraws the complaint and indicates they no longer wish to pursue the matter.

a)   The Administration Bureau Captain will confer with the involved employee's Deputy Chief to determine the need for further investigation.

8.   The Chief of Police will be responsible for:

a.   Final review and approval of allegation of misconduct investigative reports.

b.   Initiating an internal criminal investigation at any time that available factual information indicates that criminal investigative procedures are necessary in order to appropriately address the matter under investigation. In such case, the Chief of Police will:

   1)   determine whether criminal internal investigations will be conducted by departmental investigators, outside agency investigators, or both

   2)   request criminal investigative assistance from an outside agency, as deemed appropriate.

   3)   designate a Deputy Chief to coordinate the criminal internal investigation, and to maintain liaison with other involved investigative and prosecuting authorities.

9.   Criminal internal investigations will be conducted in accordance with guidelines set forth within directive PD-0902 (*Criminal and Special Purpose Investigations*).

a.   Concurrent criminal and administrative internal investigations may be conducted, at the discretion of the Chief of Police, with the criminal investigation being considered the higher priority.

b.   At any time that a department employee is interviewed with the intent of developing evidence for use in a criminal prosecution of that employee:

   1)   The employee will be advised that the investigation is criminal in nature prior to being interviewed.

   2)   Where applicable, the employee being interviewed as part of a criminal investigation will be advised of his or her constitutional rights in accordance with the *Miranda v. Arizona* Supreme Court decision.

   3)   Any waiver of rights granted by the employee will be documented by means of an *Interview: Advice of Rights* form.

   4)   The *Statement for Internal Investigative and Administrative Purposes* form will not be utilized in criminal internal investigation interviews.

c.   Criminal internal investigations will be conducted separately from administrative internal investigations.

   1)   Related criminal and administrative internal investigations will be assigned to separate investigators/investigative teams.

   2)   Criminal and administrative investigation files will be separately maintained.

   3)   Department personnel conducting a criminal investigation of an employee's activities will have no access to *Garrity*-protected statements made by that employee, or to administrative investigation findings based upon that employee's *Garrity*-protected statements.

4)   Department personnel conducting administrative internal investigations will not share either *Garrity*-protected statements made by an employee, nor administrative investigation findings based upon an employee's Garrity-protected statements, with personnel conducting a criminal investigation targeting that employee.

5)   Personnel conducting administrative internal investigations will be granted access to related criminal internal investigation interviews and information.

D.   <u>PERFORMANCE AND DEMEANOR COMPLAINT INVESTIGATION</u>

1.   For the purposes of this directive, a *Performance Complaint* and a *Demeanor Complaint* will be defined as an allegation made by any person indicating that an LPD employee's action, or failure to act, has constituted:

a.   improper or inappropriate action or response

b.   improper operation of a police vehicle

c.   a violation of established departmental or City operational policies or procedures

d.   a violation of established departmental or City employee rules of conduct.

e.   any act, or failure to act, that does not rise to the level of constituting an *Allegation of Misconduct* as defined in III.C.1.

2.   An allegation that does not specifically identify an act, or failure to act, that constitutes a performance or demeanor complaint as defined in III.D.1 will not be considered a valid complaint and will not require investigation.

3.   All valid demeanor complaints and performance complaints – including anonymous complaints --communicated to the Lynchburg Police Department in any fashion:

a.   will be documented and investigated according to procedures set forth within this directive.

b.   These investigations will be initiated as administrative investigations to serve departmental purposes.

4.   Receipt and forwarding of performance or demeanor complaints will be handled as follows:

a.   An employee receiving a citizen's complaint in person or by telephone will refer the complainant to:

1)   the involved employee's immediate supervisor, or (if unavailable)

2)   the highest ranking supervisory officer available within a reasonable period of time.

   b.  An employee receiving a citizen's complaint by mail or facsimile will forward the complaint directly to the involved employee's immediate supervisor.

   c.  Employees receiving a citizen's complaint will not discuss it with persons other than those within the involved employee's chain of command, or the supervisor who is subsequently designated to investigate the complaint.

   d.  Any employee wishing to make a performance or demeanor complaint against another employee will do so to that employee's immediate supervisor, or to the next available person within that employee's chain of command.

  5.  Investigation of performance and demeanor complaints :

*52.2.1 A*

   a.  An employee's immediate supervisor will normally be responsible for investigating performance and demeanor complaints.

   b.  The involved employee's bureau Captain may, as deemed necessary, direct that a demeanor or performance complaint be investigated by a supervisor outside the affected employee's chain of command.

   c.  The investigating supervisor will be responsible for ensuring that the investigation conducted:

     1)  is both adequate and appropriate to the nature and gravity of the complaint received

     2)  is narrowly focused on the specific performance or demeanor problem alleged.

     3)  is completed in a timely manner.

       a)  Due to the importance of providing timely feedback to involved employees, investigating supervisors will make every effort to complete performance / demeanor investigations within 30 calendar days.

       b)  As necessary, the investigating supervisor may request the involved employee's Bureau Captain to grant additional time for completion of an ongoing investigation.

   d.  The investigating supervisor's responsibilities will include:

     1)  complying with the general internal investigation guidelines set forth in section III.B of this directive

     2)  speaking directly with the complainant, whenever the complainant is known and will agree to do so, in order to:

       a)  verify that the complaint has been received by supervisory staff

       b)  ensure that the complainant's allegation does constitute a valid performance or demeanor complaint

      c)   obtain and discuss details of the complaint-related incident(s)

      d)   provide periodic reports, as necessary, on the progress of the investigation.

      e)   notify the complainant(s) of investigation conclusion

3)   speaking with the involved employee, in order to:

      a)   notify the employee that a complaint has been received

      b)   obtain and discuss details of the complaint-related incident(s)

      c)   notify the employee of investigation conclusion and findings

4)   interviewing any other employee and/or civilian witnesses to the basis of the complaint

5)   assessing all available information related to the incident

6)   noting on the *Performance/Demeanor Complaint* in Blue Team

      a)   a detailed account of the original complaint

      b)   all contacts with the complainant(s)

      c)   contact with the involved employee

      d)   his investigative findings and conclusion of fact

      e)   his recommendation for departmental action

7)   reviewing the investigative findings and action recommendation with:

      a)   the involved employee

      b)   the involved employee's chain of command

e.   The involved employee's chain of command will be responsible for:

1)   conducting or arranging for any remedial training deemed appropriate

2)   initiating any disciplinary action deemed appropriate according to procedures set forth within directive PD-0212 (*Disciplinary System*).

f.   Supervisors investigating a performance/demeanor complaint will not be required to request that the complainant(s) complete a written statement form.

1)   However, the investigating supervisor can request the complainant(s) to complete a written statement in any case where

the supervisor deems such a written statement to be a significant investigative aid.

    a)  Such written statement will be documented by means of the *Allegation of Misconduct Statement* form.

    b)  On request, the complainant may be given a copy of the completed *Statement* form *only* if the complainant has signed the form.

    c)  The original *Allegation of Misconduct Statement* form will be linked to the *Performance/Demeanor Complaint* in Blue Team.

  2)  A complainant's failure or refusal to provide a written statement will not preclude conducting a performance or demeanor complaint investigation.

*52.1.3, 52.1.9*

6.  The investigating supervisor will indicate in the space provided on the *Performance/Demeanor Complaint* form his conclusion of fact as one of the following:

  a.  **Sustained** - there is sufficient evidence to prove the allegation.

  b.  **Non Sustained** - there is insufficient evidence to either prove or disprove the allegation.

  c.  **Exonerated** - the alleged incident occurred, but the involved employee's action was lawful and proper.

  d.  **Unfounded** - the allegation is false or not factual.

  e.  **Policy Review** - the allegation is true, however the employee's practices were consistent with departmental policy: as result, the policy should be reviewed to ensure that operational practices remain consistent with the department's philosophy.

  f.  **Complaint Withdrawn** – the person who made the performance/demeanor complaint withdraws the complaint and indicates they no longer wish to pursue the matter.

    1)  The Administration Bureau Captain will determine the need for further investigation.

7.  On completing his investigation, the investigating supervisor will forward the *Performance/Demeanor Complaint* (and any attachment) to his Bureau Captain for review through Blue Team.

  a.  On approval, the Division Captain will forward the *Performance/Demeanor Complaint* (and all attachments) to the Professional Standards Division to have an internal investigation case number assigned and to maintain all investigation documents in IA Pro

    1)  performance and demeanor complaints found to be *sustained* will be:

a) cited within the employee's annual performance evaluation

b) considered in rating employee work performance during that evaluation period.

2) performance and demeanor complaints found to be *non-sustained*, employee *exonerated*, *unfounded*, or to have resulted from *policy failure* will not be cited within the employee's performance evaluation, or considered in rating employee performance during that evaluation period.

b. The employee's Bureau Captain will be responsible for:

1) ensuring that *sustained* performance and demeanor complaints are appropriately cited within the affected employee's annual performance evaluation for that period

8. The *Performance/Demeanor Complaint* (and attachments) will be considered attorney work products -- no copy in addition to those specified by directive will be made without prior authorization from the Chief of Police.

9. The Administration Bureau Captain will be responsible for:

a. periodically providing the Chief of Police with statistical and other information pertaining to performance and demeanor complaints received.

E.   UNDERLINE USE OF FORCE INCIDENT REVIEW

*1.3.7*       1.   Sworn employee use of force incidents will be reviewed by supervisory staff according to:

a. the specific guidelines and timeframe set forth within directive PD-0602 (*Use of Force*)

b. the general internal investigation guidelines set forth within this directive.

2. Such reviews will be initiated as administrative investigations to serve departmental purposes.

3. High profile use of force incidents [as defined within directive PD-0402 (*Significant Incident Management*)] will be managed according to procedures set forth within that directive.

F.   VEHICLE PURSUIT REVIEW

1. Vehicle pursuits conducted by sworn employees will be reviewed by supervisory staff according to:

a. the specific guidelines and timeframe set forth within directive PD-0702 (*Vehicle Pursuit*)

b. the general internal investigation guidelines set forth within this directive.

2.   Such reviews will be initiated as administrative investigations to serve departmental purposes.

3.   High profile vehicle pursuit incidents [as defined within directive PD-0403 (*Significant Incident Management*)] will be managed according to procedures set forth within that directive.

G.   <u>EMPLOYEE-INVOLVED MOTOR VEHICLE CRASH INVESTIGATION</u>

1.   Investigation of traffic crashes involving on-duty employees will be conducted according to:

a.   the specific guidelines and timeframe set forth within directive PD-0207 (*Employee-Related Injuries and Motor Vehicle Crashes*)

b.   the general internal investigation guidelines set forth within this directive.

2.   Such investigations will be initiated as administrative investigations to serve departmental purposes.

3.   High profile employee-involved motor vehicle crashes [as defined within directive PD-0402 (*Significant Incident Management*)] will be managed according to procedures set forth within that directive.

**35.1.9**

H.   <u>REVIEW OF EMPLOYEE "EARLY INTERVENTION SYSTEM" ALERTS</u>
*(see also III. C of 0209-Peer Support and Stress Related Incidents)*

1.   Supervisory staff will initiate an investigative review of circumstances constituting a departmental Early Intervention System "alert" situation as set forth within directive *PD-0209-Peer Support and Stress Related Incidents*).

2.   Such "alert" may be generated by the department's Early Intervention System employee information database, by supervisory review, or by information provided by coworkers or other persons.

3.   Such investigative reviews will be initiated as administrative investigations to serve departmental purposes that will include, but not be limited to, the following:

a.   identifying and addressing employee training and/or developmental needs

b.   identifying and addressing problem situations or work-related stress deemed to affect, or be likely to affect, employee well being or work performance.

4.   When the Administration Bureau Captain receives a notification from the Early Intervention System that an employee has met or exceeded the criteria for a review, the Administration Bureau Captain will:

a.   review the data base to determine what has activated the system and the accuracy of the data.

      b.   report the findings to the employee's Bureau Captain.

      c.   confer with the Bureau Captain on the appropriateness of assigning a supervisor to conduct an EIS administrative investigation.

5. The Bureau Captain will ensure a review of the early intervention report is done to determine what, if any, actions need to be taken related to the alert and will speak with the involved employee, in order to:

      a.   notify the employee that the Early Intervention System has indicated a review is in order

      b.   obtain and discuss details of the system alert

      c.   notify the employee of conclusion and findings of the review.

I. <u>FITNESS FOR DUTY AND OTHER INTERNAL INVESTIGATIONS</u>

1. Fitness for duty and other fact-finding investigations will be conducted according to general internal investigation guidelines set forth within this directive.

2. Fitness for duty and other fact-finding investigations will be initiated as administrative investigations to serve departmental purposes.

3. Guidelines and procedures for specialized internal investigations will be developed at the direction of the Chief of Police, based upon the specific requirements of the situation at hand.

4. The investigating supervisor will be responsible for ensuring that the investigation conducted:

      a.   is both adequate and appropriate to the situation being investigated

      b.   is narrowly focused on the specific performance or demeanor problem alleged.

      c.   is completed in a timely manner.

           1)  Investigating supervisors will make every effort to complete fitness for duty investigations within 50 calendar days.

           2)  As necessary, the investigating supervisor may request the Chief of Police to grant additional time for completion of an ongoing investigation.

J. <u>INTERNAL INVESTIGATION FILE MAINTENANCE</u>

1. The Administration Bureau Captain will be responsible for secure maintenance of records pertaining to completed:

      a.   allegation of misconduct investigations

      b.   performance complaint investigations

      c.   demeanor complaint investigations

  d. fitness for duty investigations

  e. other internal investigations, as directed by the Chief of Police.

  f. use of force investigations

  g. vehicle pursuit investigations

  h. other internal investigations, as directed by the Chief of Police.

3. Allegation of misconduct investigative reports and all related attachments will be identified and filed by a unique control number, and will include the following documentation:

  a. a copy of the *Allegation of Misconduct Complaint* and attachments

  b. copies of all required departmental notification letters

  c. all investigative reports and attachments

  d. the findings of the investigating supervisor with regard to the specific allegation(s) made, and any ancillary issues or allegations identified during the course of the investigation.

4. Performance Complaint and Demeanor Complaint investigative reports and all related attachments will be identified and filed by a unique control number, and will include the following documentation:

  1) a copy of the *Performance/Demeanor Complaint Investigation* completed to document case information and findings

  2) supporting information, attachments.

5. All Allegation of Misconduct, Performance Complaint and Demeanor Complaint internal investigation files will be maintained according to guidelines set forth by the Library of Virginia.

**52.1.2**

6. All internal investigation files and related records will be maintained in IA Pro.

**52.1.11**

K. <u>DISSEMINATION OF INTERNAL INVESTIGATION INFORMATION</u>

1. The Deputy Chief of the Administration Bureau will be responsible for submitting an annual report to the Chief of Police, compiling calendar year statistical summaries drawn from:

  a. allegation of misconduct investigations conducted during the study period

  b. performance and demeanor complaint investigations conducted during the study period.

2. Annual statistical summary information on citizen-initiated allegations of misconduct, performance complaints and demeanor complaints may be made available to any Lynchburg Police Department employee or any member of the general public upon request to the Administration Bureau Captain.

{00479003.DOC }

*52.2.2*

   3.    The Chief of Police will be notified of all demeanor/performance and allegation of misconduct complaints made against agency employees.

      a.   Demeanor/performance and allegation of misconduct complaints will be assigned a case control number by the Professional Standards Lieutenant.

      b.   The employee's Captain will ensure the Deputy Chief is notified of all serious or potentially "high profile" complaints (i.e. domestic violence, bribery, criminal law violations, etc.) in a timely manner.

         1)  The Deputy Chief will promptly forward this information to the Chief of Police if deemed appropriate and necessary.

*1.3.13*

   4.    The department's Field Operations Bureau Captain will be responsible for submitting an annual report to the Chief of Police, compiling calendar year statistical summaries drawn from use of force investigative reviews conducted during the study period.

   5.    The department's Crime Analyst will be responsible for submitting an annual report to the Chief of Police, compiling calendar year statistical summaries drawn from vehicle pursuit investigative reviews conducted during the study period.

*Original Signed*

_____

Ryan M. Zuidema
Chief of Police

March 14, 2019

_____

Date